# UNITED STATES v. RANDALL.

## SAME v. HACKBUSCH.

### Nos. 9286, 9298.

Circuit Court of Appeals, Seventh Circuit.

Nov. 3, 1947.

Rehearing Denied Dec. 3, 1947.

SPARKS, Circuit Judge, dissenting.

Charles J. Eichel, of Evansville, Ind., and Marvin B. Simpson and Lem Billingsley, both of Fort Worth, Tex., for appellant Randall.

Edwin C. Henning, Joseph B. Minor, and Theodore Lockyear, all of Evansville, Ind., for appellant Hackbusch.

B. Howard Caughran, U. S. Atty., and Maurice W. Graston, Asst. U. S. Atty., both of Indianapolis, Ind., and Elba L. Branigin, Jr., Asst. U. S. Atty., of Franklin, Ind., for appellee.

Before SPARKS and KERNER, Circuit Judges, and LINDLEY, District Judge.

KERNER, Circuit Judge.

The defendants were charged separately by grand jury indictment, based upon 18 U.S.C.A. § 88, with the crime of conspiracy, in violation of Section 592 of the Banking Act of 1935, 12 U.S.C.A. § 592, and were separately tried. Both pleaded not guilty. In each case, at the close of the Government's evidence, and at the close of all the evidence, the defendant therein involved moved for a directed verdict in his favor, both of which motions were denied in each case. The juries returned verdicts of guilty, judgments were rendered accordingly, and from those judgments these appeals are prosecuted.

The facts which constitute the basis of the indictment against Randall relate to the National City Bank of Evansville, Indiana (hereinafter referred to as the bank), its cashier and vice-president, Sterling J. Perry, and the defendant, Harry R. Randall. Perry had been an employee of the bank for thirty-four years. He began in 1912 as a messenger boy, worked in the different bookkeeping departments, became receiving and paying teller, assistant cashier, cashier, and after the annual meeting in January, 1946, he became vice-president. Until May 8, 1946, he bore a most excellent reputation with the officers of the bank and with the citizens of Evansville. On May 27, 1946, he drove his car to Indianapolis, surrendered to the federal authorities and admitted a shortage in his accounts at the bank of $143,278.58. Subsequently he pleaded guilty to the charge of embezzlement, and since that time has been confined in the federal prison at Terre Haute, Indiana.

The charge against the defendant Randall is that on or about the first day of January, 1940, and thereafter until May 27, 1946, he conspired with persons to the grand jurors unknown and with Sterling J. Perry, an officer of the bank, for the said Perry to embezzle and wilfully misapply monies and credits of that bank and to make and cause to be made false entries in the books, reports, and statements of that bank, with intent on the part of Randall and Perry and the said other unknown persons to injure and defraud said bank, and with the further purpose on the part of Randall and Perry to deceive the officers of that bank, the Comptroller of the Currency, the Federal Deposit Insurance Corporation, and all agents and examiners appointed to examine the affairs of that bank.

Randall's defense was that he did not know that the money with which his numerous no-fund checks over the years were being paid by Perry came out of the bank's funds, while Hackbusch's counsel contends that Hackbusch, who did not testify, really thought that all the money to cover his checks was being supplied by Perry out of his own funds, which Hackbusch considered all along as a debt he owed Perry personally, and both defendants make the point that they did not know of the existence of the special accounts opened by Perry and through which he operated.

So well is the law established that we need not cite any authorities that a reviewing court must not undertake to determine the weight of the evidence or the credibility of the witnesses. An appellate court in examining the record, must take that view of the evidence most favorable to the plaintiff, and must give to the plaintiff the benefit of all inferences which reasonably may be drawn from the evidence. In such appeals the question presented is not whether the evidence is suf-

ficient to prove defendant's guilt beyond a reasonable doubt, but rather, whether the verdict is supported by any substantial evidence, direct or circumstantial. Having these principles in mind, we proceed to relate the more important facts established by the verdicts of the juries and the law applicable thereto.

There is no dispute concerning the fact that Perry embezzled and misapplied the funds of the bank, nor is there any dispute that at least $16,335.98 of the bank's funds was misapplied by Perry to Randall's no-fund checks. Perry testified that $50,000 or $60,000 of his shortage at the bank went to Randall and that at least $27,582.91 of the funds embezzled and misapplied by him was used to take care of Hackbusch's no-fund checks. Perry, however, testified that all of the checks handled by him out of the bank's funds for Hackbusch amounted to between $40,000 and $50,000.

Randall was a native of Canton, Pennsylvania. He had been engaged in the business of oil explorations, drilling wells and producing oil for twenty years. He moved to Evansville, Indiana, and has lived there continuously since the latter part of 1939. On June 16, 1939, he opened a checking account with the bank. This account was closed on July 2, 1941. The record discloses that Perry's salary ran from $300 to $400 per month; that he did not own his home; that his net worth in actual money in 1940, or at any time since then, was not more than $5,000; that Perry and Randall had in 1940 discussed their relative financial conditions with each other; and that on December 1, 1940, Randall wrote Perry a letter explaining his (Randall's) desperate financial condition. In this letter Randall said: "I am without any money at all and at the moment do not know where to turn—* * *. * * * I know that I can or could still get this through if I had the money to stay with it. But know you have gone beyond what you should already."

On March 20, 1940, the bank, through Perry, loaned Randall $750, for which the latter executed his note to the bank. It was not paid when due, and the bank records disclose that later it was charged off as a loss. The record does not disclose just when Perry began advancing money to Randall, but both agree that whenever it was, the advances were in small amounts. Perry testified that these early advances were made by him personally, but when Randall's demands got larger (about the middle of 1942), he took care of Randall's no-fund checks by paying them with bank funds; that he handled these no-fund checks through the "cash item drawer" until September 25, 1943, when he opened two special accounts, under his own supervision, to take care of them; that all deposits in these special accounts were on deposit tickets showing "cash," the money coming out of the bank's funds; that during 1944, through this account, Perry cashed 197 of Randall's checks aggregating $8,953.92, 108 checks aggregating $3,761.28 during 1945, and 76 checks aggregating $3,620.87 during the period from January, 1946, to May 27, 1946. All of these checks were signed by Randall individually and when he had no account to which they could be properly charged. Perry also testified that after cashing these no-fund checks, he, from time to time, delivered them to Randall.

Randall testified that he had no knowledge or information of the existence of those accounts, that he never wrote any checks on those accounts, and that he never received a statement from the bank or from anyone as to the condition of any of those accounts. Both Randall and Perry testified that Perry told Randall to write checks on the bank and that he, Perry, would furnish the money with which to pay them.

Hackbusch and Randall were separately charged with separate conspiracies in conjunction with Perry, and other unknown parties, for Perry to embezzle the bank's money. The items of embezzlement which were the subject of the separate alleged conspiracies were not the same, and were not related in any respect, except that Perry, prior to the trial of these cases, pleaded guilty to the embezzlement of the bank's money, which included the money he had paid to both of these defendants, or for their benefit. The indictments are identical

except as to names and overt acts. Hackbusch pleaded not guilty and did not testify.

About February 26, 1942, Hackbusch opened a checking account with the bank. Checks against this account were to be signed "Bristol Hackbusch, Trustee," This account ran from February 26, 1942 until after May 27, 1946, when Perry made a disclosure of his shortage.

Hackbusch became acquainted with Perry about the middle of 1942 and from that time practically all of his transactions with the bank were conducted by and through Perry. Sometime after Hackbusch had met Perry, Hackbusch requested Perry to help him out financially, and for a while Perry did make him small personal loans, but Hackbusch's oil business grew worse and his demands for money became larger, so that Perry was not able to advance Hackbusch sufficient amounts out of his personal funds; thereafter Hackbusch and Perry from time to time talked about these matters and Perry began handling Hackbusch's no-fund checks as cash items in the bank. For a while Hackbusch would come in with or send in some money to take care of part of the checks so that they could be taken out of the cash item drawer and cleared through Hackbusch's trustee account, but for the payment of many of these checks Hackbusch made no funds available and Perry merely took the checks out of the cash item drawer, perforated them, and returned them, in person, to Hackbusch at his office without charging them to any account.

On September 25, 1943, Perry decided that he would have to adopt a different system of taking care of Hackbusch's no-fund checks. He opened an account in the name of "S. J. Perry Special" by a misapplication of $1,500 of the monies of the bank, but by the time it was necessary to misapply more money of the bank to meet the incoming no-fund checks, on October 19, 1943, the name of the account was changed to "S. Hackran." During the period of September 25, 1943 to March 21, 1944, Perry cashed through this account 215 of Hackbusch's no-fund checks aggregating $7,838.88.

It also appears that on December 3, 1945, Hackbusch wrote Perry a letter in which he said: "Here are some checks. However you may only look at the one for $27,000. That one will go in escrow at Owensboro but the $4000.00 you can deposit to my account. Which will help." In that letter Hackbusch also said: "There will also be another check in the mail to National City Bank for $7500 that we did not have time to make out today. That's for another well." It also appears that some 595 of Hackbusch's no-fund checks sent to the bank bear only Hackbusch's personal signature without the addition of the word "Trustee."

The evidence further discloses that on May 23, 1944, Hackbusch sent through the mails to the credit manager of the National Supply Company at Pittsburgh a statement on a form provided by that company, calling for a disclosure of all of Hackbusch's indebtedness. In this statement Hackbusch made no mention of any indebtedness to Perry or anyone else, resulting from his withdrawals on his no-fund checks. At the time he mailed this financial statement, his no-fund checks aggregated about $15,-000.

At the outset it is well to state that the government was not required to prove that defendants knew Perry's modus operandi, Keliher v. United States, 1 Cir., 193 F. 8, 17, and that the law presumes every sane person who has attained the age of discretion contemplates and intends the natural and necessary consequences of his acts, United States v. Harter, 7 Cir., 116 F.2d 51, 56, and United States v. Fleenor, 7 Cir., 162 F.2d 935, 937, and the question of whether defendants ever intended for Perry to embezzle and misapply the bank's money or knew that Perry was doing so, presented a jury question. Looker v. United States, 2 Cir., 240 F. 932, 934, and Hawley v. United States, 10 Cir., 133 F.2d 966, 970.

Conspiracy is rarely capable of proof by direct evidence, hence it is not necessary that the participation of one charged with conspiracy should be shown by direct evidence. The common design is the essence of the crime, and this may be

made to appear when the parties steadily pursue the same object, whether acting separately or together, by common or different means, but ever leading to the same unlawful result. If the parties act together to accomplish something unlawful, a conspiracy is shown, even though the individual conspirator may have done acts in furtherance of the common unlawful design apart from and unknown to the others. Allen v. United States, 7 Cir., 4 F.2d 688, 691. The connection may be inferred from such facts and circumstances in evidence as legitimately tend to sustain an inference that the overt acts were in furtherance of the common design, intent and purpose, United States v. Manton, 2 Cir., 107 F.2d 834, 839, and United States v. Holt, 7 Cir., 108 F.2d 365, 368; that is to say "a common purpose and plan may be inferred from a 'development and a collocation of circumstances.'" Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680. Compare Nelson v. United States, 8 Cir., 16 F.2d 71, and Ray v. United States, 8 Cir., 114 F.2d 508.

■■■ To be sure, men of ordinary intelligence may differ as to the reasonable inferences to be drawn from the evidence, but in such a situation, it is a question for a jury, Glass v. United States, 3 Cir., 231 F. 65, and if the established facts and inescapable inferences are inconsistent with the accused's professions of innocence, it becomes the problem of the jury to weigh the evidence and determine, under proper instructions dealing with the quantum of proof necessary to convict, the guilt or innocence of the accused. United States v. Morley, 7 Cir., 99 F.2d 683, 685.

■■■ Defendants also stress the fact that Perry in the memorandum which he left in his desk, said, "I alone am responsible." Even so, we think that statement had reference to the employees of the bank, since and just preceding the statement that he alone was responsible, he said, "No person employed in this Bank had any part in this matter either directly or indirectly." But be that as it may, it remained for the jury, from all the evidence, to say whether defendants were guilty.

In the Ray v. United States case, supra, defendant Ray and one Mary V. Schutte, cashier of a national bank, were charged with violating § 592 of the Banking Act of 1935. As in the instant case, it appeared that Ray had drawn checks on the bank when he knew that he had no funds on deposit with which to pay them. The cashier admitted her guilt in all respects, related how for a period of years Ray had overdrawn his account and that she had paid Ray's checks by misapplication of the funds of the bank. She testified that she pursued this course of conduct because of her friendship for Ray and his family and that Ray was innocent. The jury found Ray guilty and the reviewing court affirmed. The Supreme Court denied certiorari, 311 U.S. 709, 61 S.Ct. 318, 85 L. Ed. 461.

■■■ Finally, Hackbusch complains, that certain language used by the trial judge was prejudicial. It appears that the jury had been out over night and when called into court the next morning, the following transpired:

"The Court: Are there any questions of the law or any questions of the instructions of the Court that you cannot understand?

"The Foreman: I think there might have been a little doubt about the instructions, interpretation of conspiracy, possibly a definition of it.

"The Court: Well, I think I covered that so fully that I doubt if I could make it any more clear, if I would attempt to.

"I would assume from what you said it is largely a question of fact, isn't it?

"The Foreman: I don't quite know how to express it, but there is some doubt in some of the minds on whether conspiracy was perpetrated.

"The Court: Well, it is a question of fact that the jury has to determine. That is exactly the question.

"Now, I want to say this to you men: You took this case last night, when you were tired and when I was tired, and you went to work after dinner, when you were still tired, I know, and worked faithfully no doubt during the evening trying to arrive at some conclusion.

"This case must be determined some time by somebody, and it is the duty of the jury to determine the case, if it is possible at all. If there were three judges, the three judges would have to get together on a judgment. Twelve jurors have always determined criminal cases and civil cases by getting together on a consensus of opinion that all could endorse.

"No man, of course, should give up any conscientious conviction on a question of fact, but it is the duty of each juror to discuss earnestly with the other jurors every question that is involved, and to strive to get together in agreement upon some solution that all of you can endorse. That is the way jury verdicts are arrived at, and it is very important that no man should make up his mind to just simply sit back and say, 'This is the way I feel about it—take it or leave it.'

"You must discuss with one another. You must review the evidence over and over again, if necessary, go through it, consider it, and reach a unanimous conclusion, if possible.

"I say, I don't ask you and don't suggest even, that you give up a conscientious scruple or conviction, but I do ask you to strive earnestly to reach a verdict, one that you can all say, 'This is my verdict.'

"Now, I want you to go back to the jury room, and go through the evidence again, and if necessary a second time—go through it and keep working.

"I sometimes work for days, trying to reach a solution of a case. I don't quit working. The jury must work, and you just can't guess a case off. You have got to work at it, review and review, try to get together. That is the purpose and the duty of the jury and if the juries will not get together, the courts are stale-mated, they can't make any progress."

The request of the jury having been complied with and no objection by counsel being interposed, the jury again retired and thereafter, after more than two hours of deliberation, returned their verdict of guilty. There is no merit in this contention. See United States v. King, 2 Cir., 162 F.2d 594, and cases cited.

 We have also considered Randall's contention that the court erred in denying his counsel's request to argue to the jury that a conviction would deprive him of his citizenship, and find it lacks merit.

We think it is clear from the records in these cases that the juries could infer the existence of a conspiracy in each case and the participation of each of the defendants therein, that there was substantial evidence of their guilt, and that the judgments should be affirmed. It is so ordered.

SPARKS, Circuit Judge, dissents.