**UNITED STATES v. CORRIGAN et al.**

No. 183, Docket 20876.

Circuit Court of Appeals, Second Circuit.

May 28, 1948.

---

642

Albert L. Solodar, of New York City (John McKim Minton and Harold H. Levin, both of New York City, of counsel), for appellants.

John F. X. McGohey, U. S. Atty., of New York City (Frank H. Gordon, Sp. Asst. to the Atty. Gen. William E. Foley, of Boston, Mass., and Bruno Schachner, Asst. U. S. Atty., of New York City, of counsel), for appellee.

Before L. HAND, SWAN and FRANK, Circuit Judges.

SWAN, Circuit Judge.

Upon trial to a jury the appellants, Corrigan, Wells and their corporation, Corrigan, Osburne & Wells, Inc., were convicted of having conspired to defraud the United States of the faithful and impartial services of Corrigan as a civilain employee of the Navy and as a naval officer. Corrigan was sentenced to eighteen months' imprisonment and fined $5,000, Wells was sentenced to a year and a day, and the corporation was fined $10,000. Their appeals raise only two contentions: (1) that the evidence was insufficient to sustain the verdict; and (2) that error was committed in the admission of Exhibits 39 and 40 which will be described hereafter.

Corrigan entered the service of the Navy as a civilian employee at the end of March 1942 and shortly thereafter was commissioned Lieutenant Commander and, later, Commander. His duties were to inspect the plants of manufacturers who were under contract to supply war materials to the Bureau of Ordnance, and to report to his superiors what action should be taken by the Navy to facilitate the production of such materials. The indictment, filed December 19, 1944, charged that Corrigan and Wells, who conducted a management engineering business through their corporation, Corrigan, Osburne & Wells, Inc., conspired to make use of Corrigan's position with the Navy to induce contractors whose plants he inspected to employ the services of said corporation. More specifically the charge was that the reports Corrigan made after his inspections would favor those contractors who employed, or indicated their willingness to employ, Corrigan, Osburne & Wells, Inc., as management engineering consultants. It is obvious that this kind of

charge can be proved only by indirect evidence. The testimony and exhibits were voluminous. To restate the entire evidence would be quite impractical; nor is it necessary. After verdict all permissible inferences must be made in favor of the prosecution. United States v. Bushwick Mills, 2 Cir., 165 F.2d 198.

█ In our opinion there was ample evidence to sustain the convictions. Corrigan was graduated from the Naval Academy in 1920. After a short period of active duty he left the Navy to engage in business. In 1939 he formed a partnership with appellant Wells, who was an industrial engineer, to engage in business as management engineering consultants. Shortly thereafter they caused the business to be incorporated as Corrigan, Osburne & Wells, Inc., each taking one-half of the controlling stock. Corrigan was elected president of the corporation. He was to devote his energies principally to sales activities while Wells was in charge of the engineering. Each was to receive an annual salary of $12,000, but during 1940 and 1941 the profits of the business were insufficient to pay the full amount of their salaries. In the spring of 1942, Corrigan was interviewed by Admiral (then Captain) Ruddock of the Bureau of Ordnance with a view to interesting him in returning to the Navy. The position Captain Ruddock had in mind for Corrigan was a vacancy in the Production Division of the Bureau of Ordnance; he was to be production "trouble-shooter" in war plants working under contracts with the Navy. Captain Ruddock required as a condition precedent to his employment by the Navy that Corrigan "sever his connections" with Corrigan, Osburne & Wells, Inc., in order "to avoid any conflict of interest." This Corrigan agreed to do, and he did resign as a director and as president of the corporation, Wells being elected president in his stead. He did not, however, "sever his connections" with the corporation. He continued to receive a salary, being paid by the corporation approximately $35,000 during the 26 months he was in the Navy. That he was aware of the impropriety of such payments is a fair inference from the fact that he concealed them from his superiors even when he wrote a letter to the Chief of the Bureau of Ordnance purporting to disclose his relations with Corrigan, Osburne & Wells, Inc.[1]

In addition to remaining on the payroll Corrigan continued an active interest in the company and constantly wrote and telephoned Wells about its business affairs. In violation of Navy regulations he furnished Mr. Amour, head of the company's Chicago office, a list of the contractors with whom the Bureau of Ordnance was doing business. This list was classified by the Navy as "Restricted" information and thus was not available for general distribution, and Corrigan warned Amour to burn the list when through with it. He concealed his continuing connection with the company not only from the Navy but also from several contractors whose plants he inspected. In numerous instances he would tell the contractor that production could be improved by the employment of a management engineer consultant, and would state that he had formerly been, but was no longer, connected with Corrigan, Osburne & Wells, Inc., a management engineering company of the type needed, thus implying that this company could furnish the needed services. Subsequently Wells or some other representative of the company would call on the contractor and endeavor to sell its services, and the latter would often indicate that he already knew of Corrigan's inspection. In some instances if the company was not employed, Corrigan's report to the Navy would criticize adversely the contractor's production methods.

˙ It is the cumulation of instances of this sort which is particularly significant. If a government official repeatedly recommends

[1] Appellants attempt to justify the continued salary payments made by the firm to Corrigan by Section 3(f) ⁄ of the Selective Training and Service Act of 1940, 50 U.S.C.A.Appendix, § 303(f), which permitted service personnel to receive compensation from their former civilian employers. But we do not believe that Congress intended by this to allow salary payments where as here there was an obvious conflict of interest between official duties and private interests. See 40 Op.Atty.Gen.Nos.42, 47, 48; United States v. Carter, 217 U.S. 286, 306, 30 S.Ct. 515, 54 L.Ed. 769, 19 Ann.Cas. 594.

a company in which he falsely pretends to have no interest, it is a permissible inference that his recommendation is actuated by some motive other than solely the discharge of his duty. And the inference is confirmed by Corrigan's constant communications with Wells concerning the company's business.

To all the above the appellants make no real answer except to relate evidence which tended to exonerate them. Such evidence is not relevant on appeal; our function is merely to determine whether the prosecution's evidence, if credited by the jury, is sufficient to support the verdict. United States v. Compagna, 2 Cir., 146 F.2d 524, 526, certiorari denied 324 U.S. 867, 65 S.Ct. 912, 89 L.Ed. 1422; United States v. Randall, 7 Cir., 164 F.2d 284, 286. On this issue we entertain no doubt.

Exhibits 39 and 40, the admission of which is urged as error, are related to an inspection and report made by Corrigan of Waterbury Tool Division of Vickers, Inc. Before Corrigan was employed by the Navy he and Wells had endeavored unsuccessfully to sell the services of Corrigan, Osburne & Wells, Inc. to Waterbury Tool Division. When Corrigan made his official inspection of the plant in the summer of 1942 he criticized the management and production methods, and told the plant manager that the troubles stemmed from failure to have employed the services of Corrigan, Osburne & Wells, Inc. As a result of Corrigan's report to the Navy Waterbury lost its "E" award. In order to meet the charges contained in Corrigan's report, Mr. Vickers, president of Vickers, Inc., caused an investigation to be made by his own production executives, two of whom were Allen and Herman. Their reports to Mr. Vickers indicated that Corri-gan's criticisms were baseless. Allen's report was received in evidence as Exhibit 39 and Herman's as Exhibit 40. Each expressed the opinion that Corrigan was biased and had prejudged the case.[2]

The admission of these reports came about in the following way. Mr. Vickers wrote a letter to the Navy to answer Corrigan's charges. This was received in evidence as Exhibit 37. On the direct examination of Mr. Vickers he testified that his letter was based upon an investigation he had caused to be made of the Waterbury plant. On cross-examination he was asked about this investigation and testified that Allen was one of the investigators and Allen "sent a number of other key men in there to check all the departments." He was then asked "whether they made any recommendations," to which he replied that "Most of the recommendations were made by Mr. Allen after his people had reported to him, and he reported to me." This was followed by the question "What recommendations were made?" and the answer "His recommendations were mostly that everything was going according to plan and that if we continued with the plan that the production would be all right." After a lengthy digression the cross-examiner returned to the subject of Allen's investigation and Mr. Vickers testified that Allen "put his top operating men in all departments in there in order to furnish him with information as to what part, if any, of the charges were true and what should be done about it and give me a complete report on that." One of these "top operating men" was Herman, although he was not mentioned by name in the cross-examination relating to the investigation. On redirect Mr. Vickers said that his letter, Exhibit 37, was based on Allen's report and Herman's report. These

[2] Allen's report said of Corrigan's report to the Navy: "It has all the earmarks of being written for the sole purpose of substantiating a predetermined conclusion. Every statement contained in this report could be made about any plant in the States and be considered true if some small supporting fact was exaggerated sufficiently and all other facts were ignored."

Herman's report was even more severe in criticizing Corrigan's. It states that "The report is biased and filled with personal opinions all directed toward proving a conclusion decided upon in advance of the investigation," and it concludes with the statement: "It is my opinion that he is trying to sell the same type of system he attempted to sell to Waterbury some time ago when he was selling business efficiency systems. My reaction is that he is a salesman for production systems, rather than an experienced production executive. This, if true, accounts for much of the vagueness in his report."

reports were then offered in evidence on the ground that "the matter was gone into" on cross-examination. Objection to their admission was made on the same ground that government counsel had made in objecting to the admission of defendants' Exhibit U for identification,[3] and on the additional ground that they were not reports of a government official and had never been brought to the attention of the defendants. Decision had been reserved as to Exhibit U for identification and the same action was taken as to Allen's and Herman's reports. Later the court admitted all three documents and defense counsel said nothing to indicate dissatisfaction with the ruling.

 The prosecution relies upon the principle that the defense "opened the door" by cross-examining Vickers as to the investigation by Allen and "other key men" and asking "whether they made any recommendations" and what the recommendations were on which Vickers had based his letter, Exhibit 37. The doctrine of "opening the door" is an application of the principle of "completeness"; that is, if one party to litigation puts in evidence part of a document, or a correspondence or a conversation, which is detrimental to the opposing party, the latter may introduce the balance of the document, correspondence or conversation in order to explain or rebut the adverse inferences which might arise from the fragmentary or incomplete character of the evidence introduced by his adversary.[4] The rationale of the doctrine of completeness has been stated by Professor Wigmore: "To look at a part [of an utterance] alone would be to obtain a false notion of the thought. * * * One part cannot be separated and taken by itself without doing injustice, by producing misrepresentation"; and again, "possibilities of error lie in trusting to a fragment of an utterance without knowing what the remainder was"; consideration of the whole is needed "to avoid the danger of mistaking the effect of a fragment."[5] The effect of "opening the door" has been well and tersely defined in Hayden v. Hordley, 94 Vt. 345, 349, 111 A. 343, 345: "[The rule] is protective, merely. It goes only so far as is necessary to shield a party from adverse inferences, and only allows an explanation or rebuttal of the evidence received." Such being the rationale of the doctrine, it cannot properly be invoked in the case at bar to support the introduction of Exhibits 39 and 40. Nothing in Mr. Vickers' letter, Exhibit 37, nor in the testimony he gave on cross-examination concerning the investigation he initiated or the recommendations made to him by Allen and Herman required supplementation to make them clearly understandable. Nor could they give rise to any inference adverse to the prosecution and favorable to the defendants. Indeed, Vickers' answer that "His [Allen's] recommendations were mostly that everything was going according to plan and that if we continued with the plan that the production would be all right," was favorable to the prosecution rather than to the defendants, since it might create the inference that Corrigan's criticism of the plan was unjustified. Hence, to admit the reports of Allen and Herman on the theory that the defense "opened the door" by cross-examination would extend the doctrine beyond any authorities that have come to our attention and beyond the reasons which support it. That the reports contained prejudicial expressions of opinion as to Corrigan's bias and motives needs no argument. Whether in fact the reports influenced the jury's verdict is of course, unknown and is immaterial, for an accused is entitled to have incompetent, prejudicial evidence excluded from the jury's consideration. Accordingly the judgments must be reversed and the cause remanded for a new trial. It is so ordered.

---

3 This was a memorandum from one member of the Bureau of Ordnance to another.

4 Cohen v. United States, 2 Cir., 157 F. 651, 656; Emanuel v. United States, 2 Cir., 196 F. 317, 322; Vause v. United States, 2 Cir., 53 F.2d 346, 352; Grobelny v. W. T. Cowan, Inc., 2 Cir., 151 F.2d 810, 812.

5 See Wigmore, Evidence, 3rd ed., §§ 2094, 2104, 2113, 2119, 2120.