**Russell Wayne CARPENTER, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 7686.**

United States Court of Appeals
Fourth Circuit.

Argued Jan. 13, 1959.

Decided March 12, 1959.

Albert J. Ahern, Jr., and James J. Laughlin, Washington, D. C., for appellant.

A. Andrew Giangreco, Asst. U. S. Atty., Alexandria, Va. (L. S. Parsons,

Jr., U. S. Atty., Norfolk, Va., on the brief), for appellee.

Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

HAYNSWORTH, Circuit Judge.

The defendant was convicted upon all counts of indictments charging him with the interstate transportation of (1) two persons, known to have been kidnapped, from the District of Columbia to Virginia, (2) one person, known to have been kidnapped, from Virginia to South Carolina, (3) an automobile, known to have been stolen, from the District of Columbia to Virgina, and (4) another automobile, known to have been stolen, from Virginia to South Carolina. The defendant did not deny his participation in the offenses charged, but claimed he was temporarily in such a psychotic condition, because of fear of his companion in crime, that he was not responsible for his conduct.

On the evening after Christmas in 1957, Carpenter, a young man of 22 years, with an older man, Henry Clay Overton, who had befriended him, set out for an evening of indulgence in the pleasures of Washington's taverns. Late in the evening, they became involved in an altercation in the Jo-Dell Tavern. They left, presumably to arm themselves, and returned. Exactly what then happened does not clearly appear in this record, but it does appear that several people were killed, others wounded, and there was testimony that later in the night, they boasted of having killed three people and that Carpenter said it was the first time he had killed anyone but that "it didn't bother him because all it made was some little red spots on the man's shirt."

The two left the area of the tavern in Overton's automobile, Carpenter doing the driving. A little later they came upon a young couple, Doris Mattingly and Larry Monteith, sitting in Monteith's automobile in front of the Mattingly home in the District of Columbia. Carpenter, with a 45-caliber automatic

pistol in his hand, commandeered the Monteith car and ordered Monteith into the rear seat. Overton then came to the Monteith vehicle, armed with a sawed-off shotgun and carrying a box of ammunition. Carpenter took the driver's seat in Monteith's Chevrolet, while Overton entered the car from the other side, Miss Mattingly being between them. Carpenter drove the car into Virginia.

Some miles south of Richmond, while Overton slept, Carpenter stopped the car and released Miss Mattingly, requesting her to refrain from calling the police for at least an hour and a half. A little later, Overton awoke, and he and Carpenter became concerned that law enforcement officials might be watching for the Monteith car. To be certain Monteith could not identify the next automobile they took, they locked him in the trunk of his automobile.

Arsonia Gooch Allman arose early on the morning of December 27, 1955, and at 5:00 o'clock left her home in Richmond for a trip south in her new Buick. She had passed Petersburg and was proceeding toward South Hill, Virginia, when she was overtaken by the Monteith automobile. Overton shouted to her and brandished his sawed-off shotgun as Carpenter drove in front of her and forced her to a stop. Overton got out, ordered her to move over and seized control of her car, while Carpenter parked the Monteith automobile in a side road, its owner still locked in the trunk.

Overton and Carpenter continued to drive south with their new prisoner, until they reached a wooded area in South Carolina. There Carpenter took their prisoner into the woods and compelled her to remove most of her clothing, which he then used to bind her hands and feet. There he left her, returned to the automobile, and he and Overton resumed their journey.

After their arrival in Miami, they approached what they believed to be a "roadblock." Alarmed, they drove around a block, stopped and turned off their headlights. Seeing a vehicle coming their way, they became fearful it

contained policemen. They both fled. Overton later returned to the automobile and headed north again. Traveling at very high speed in an effort to escape close pursuit in Georgia, he collided with another vehicle, killing the driver of the other car and himself. Meanwhile, Carpenter made his way to Miami Beach where he threw away the pistol he had used. On the evening of December 30th, Carpenter was arrested in West Palm Beach, and the escapade was at an end.

At the trial, the defense undertook to cast Carpenter in the role of another victim of Overton's dominance enforced at gun point. Emphasis was placed upon Overton's braggadocio about his slayings and his description of himself as a "real Jesse James." Monteith said that Overton was obviously drunk, and Carpenter, estimating that Overton had consumed one and a half fifths of a gallon of whiskey during the night of December 26–27, agreed that Overton was drunk, but insisted that, when they left the Jo-Dell Tavern, Overton was not so drunk as crazy. It was proved that Overton was a diabetic, and expert opinion was elicited that some diabetics in shock are belligerent. Carpenter testified that he, as well as the kidnap victims, was under the constant threat of Overton's loaded shotgun, that the pistol previously had been his, but he recently had sold it to Overton and was permitted by Overton to possess it from time to time during their adventure, and that everything that he did was done in fear of Overton in order to preserve his own life and that of the kidnap victims, who would have been shot, according to Carpenter's statement of Overton's threats to him, if Car-

penter escaped. He testified that he did not recognize various occurrences as affording opportunity to escape safely from Overton without risk of harm to any kidnap victim, until their separation in Miami, and that he availed himself of that opportunity.[1]

This version of events, the defense sought to support with the testimony of two psychiatrists who expressed the opinion that Carpenter, on December 27, was temporarily insane out of excessive fear of Overton and that his mental condition then was such that he could not have distinguished right from wrong.

On direct examination, Carpenter testified fully about all relevant events, except those occurring inside the portals of the Jo-Dell Tavern. On cross-examination the prosecutor sought to question him about the occurrences inside the tavern, and the defense objected that such inquiry was improper and beyond the scope of the direct examination. When the questions were ruled proper cross-examination, Carpenter, on advice of his counsel, refused to answer them upon the ground that he was then under indictment in the District of Columbia for homicides committed in the tavern and that his answers to the questions would tend to incriminate him. Carpenter persisted in his refusal to answer after the Court ordered him to answer the questions, for which, in the absence of the jury, he was cited for contempt. The Court instructed the jury that consideration might be given, along with all other facts and circumstances, to Carpenter's refusal to answer the questions on cross-examination.

1. The testimony of other witnesses about the events, including reference to several "orders" that Carpenter gave to Overton and to them, abundantly warranted the jury's conclusion that Carpenter was not dominated by Overton, was sober and an active principal in the crimes. A lieutenant of police who talked with Carpenter in West Palm Beach immediately after his arrest testified that Carpenter said nothing of having been in fear of Overton, but had told of his effort to rejoin Overton in Miami, an effort which failed only because Carpenter, in his flight, became confused about directions and could not refind the spot where the automobile had been abandoned. The police official also testified that Carpenter had told, with some amusement, that, knowing of the intensive police search being conducted for him, he had stood on a street in Boca Raton immediately across from the police station and there, within plain view, sought a lift from passing motorists.

In objecting to his cross-examination, the defendant mistakenly relies upon such cases as United States v. Corrigan, 2 Cir., 168 F.2d 641, and United States v. Provoo, 2 Cir., 215 F.2d 531, his assumption being that any evidence of any occurrence in the Jo-Dell Tavern would not have been admissible unless made so because of some fragmentary disclosure out of the mouth of the defendant himself.[2] Carpenter's only defense was his claim of mental incapacity arising out of fear of Overton, a condition for which their prior, rather intimate, relationship held no presage, but which was full blown when they made their way out of the tavern. Surely it was relevant and material to inquire of him how he thus came to be reduced to this lowly and unexpected condition. If it appeared, as the prosecutor's questions suggested, that in the tavern Carpenter was not the cringing victim of Overton's threats but the cold killer returned to avenge with gunfire Overton's bloody nose, Carpenter's defense would be demolished. Claiming, despite substantial extrinsic evidence to the contrary, that he was put in such sudden terror by his old friend, gone abruptly berserk, that he was temporarily insane, it is hardly persuasive for Carpenter to contend that it is quite irrelevant how this turn of events came about. When a condition of temporary insanity is claimed to have existed, its cause and the events which created it seem obviously material to the inquiry into the existence of the claimed disability.

We do not understand, however, that Carpenter seriously questions the relevance of the events in the tavern to his defense. Rather, he contends that the scope of cross-examination was strictly limited to those objective events of which he told on his direct examination, at least that such limitations should be imposed

in the light of his privilege against self-incrimination.

Firmly rooted in our judicial history is the principle that a defendant in a criminal case, who cannot be compelled to testify and whose failure to do so may not be made the subject of adverse comment, cannot prescribe and impose limitations upon his waiver of his privilege against self-incrimination when he voluntarily takes the witness stand. When he chooses to testify freely to those events and circumstances which tend to support his defense, neither the Constitution nor any consideration of justice requires that he be permitted selectively to suppress other relevant facts which may be incriminating or inconsistent with his defense. "(H)e has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts." Fitzpatrick v. United States, 178 U.S. 304, 315, 20 S.Ct. 944, 949, 44 L.Ed. 1078, 1083. "When he took the witness stand in his own behalf he voluntarily relinquished his privilege of silence, and ought not to be heard to speak alone of those things deemed to be for his interest, and be silent where he or his counsel regarded it for his interest to remain so, without the fair inference which would naturally spring from his speaking only of those things which would exculpate him and refraining to speak upon matters within his knowledge which might incriminate him." Caminetti v. United States, 242 U.S. 470, 494, 37 S.Ct. 192, 198, 61 L.Ed. 442, 456.

It matters not that the defendant's claim is that his answers to the line of inquiry would tend to establish his guilt of homicides for the commission of which he was then under indictment, but not on trial. So long as the inquiry was relevant to the issue in the case then

---

2. Were his assumption correct, his conclusion might not follow. Carpenter, in his direct examination, carefully avoided direct testimony about the homicides committed in the tavern. However, he explained Overton's bloody shirt as the consequence of an altercation that oc-

curred there, estimated Overton's consumption of whiskey, part of which, at least, was consumed there, and related the commencement of Overton's dominating frenzy and his own fearful subservience to the occurrences in the tavern.

being tried and the answers were within his knowledge, the inquiry was within the compass of the waiver of his privilege when he voluntarily became a witness, and his refusal to answer became a proper subject of comment and consideration. See Johnson v. United States, 318 U.S. 189, 63 S.Ct. 549, 87 L.Ed. 704.

■ The fact that Carpenter was later found guilty of contempt and was given a sentence to run concurrently with his much longer sentences upon his conviction upon the charges of the indictments, may be of no practical moment to him in view of our disposition of the other questions raised on this appeal. It would seem, however, that a defendant in a criminal case who testifies, as any other witness, may be punished for contempt when he obstinately refuses to answer questions after having been ordered to do so and having been given adequate warning. The fact that he may have believed, though mistakenly, that he had a right to refuse to answer well may affect a determination of the punishment to be administered, but does not relieve him of the contempt. See Brown v. United States, 356 U.S. 148, 78 S.Ct. 622, 2 L.Ed.2d 589.

■ Relying upon Wright v. United States, 102 U.S.App.D.C. 36, 250 F.2d 4, and Douglas v. United States, 99 U.S. App.D.C. 232, 239 F.2d 52, Carpenter next contends that he was entitled to a judgment of acquittal since he produced medical opinion that he was temporarily, or momentarily, insane on the night of December 26–27, 1957, and no other medical expert expressed a contrary opinion. Unlike Wright and Douglas, however, Carpenter was shown to have been a normal person without an objective history of mental disease. If ever expressions of expert opinion upon an ultimate issue to be decided by the jury, without clear support of other facts objectively and conclusively established,

may be said to be binding upon the jury,[3] this is not such a case.

Dr. Odenwald and Dr. Miller interviewed Carpenter approximately four months after the event, Dr. Odenwald for approximately an hour, Dr. Miller for less than three. One or both obtained additional information about the family history from Carpenter's relations. Carpenter told them his version of the events after leaving the Jo-Dell Tavern, but told them nothing of what occurred inside the tavern, for, as Carpenter told Dr. Miller, he had been instructed not to discuss that. Nevertheless each ventured the opinion that Overton had supplied Carpenter's deep need for fatherly guidance and care, that when Overton, for some unexplained reason, was suddenly changed into a "monster," a crazy man determined to kill Carpenter for the least disobedience, Carpenter was terrified, filled with anxiety, his reason temporarily displaced by his instinct for self-preservation, and, for the time being, he became incapable of distinguishing between right and wrong. At the time of the interviews, each found Carpenter to be normal, and their opinion of his mental state on the night of December 26–27 was clearly founded upon their assumption of the truth of Carpenter's description of his emotions and the events after he had left the tavern. Thus, each spoke of his being "forced" to drive to Virginia, obeying, as most normal individuals would, because there was a gun in his back.

■■ If the facts were not what the doctors supposed, their opinions were baseless and of no evidentiary value. This, each recognized. Dr. Odenwald said that, if Carpenter had killed a man in the Jo-Dell Tavern, it would change his whole thinking, while Dr. Miller said if Carpenter described that killing as Monteith testified it would certainly affect his judgment.[4]

---

3. See Holloway v. United States, 80 U.S. App.D.C. 3, 148 F.2d 665; Arena Company v. Minneapolis Gas Company, 8 Cir., 234 F.2d 451; Boston Ins. Co. v. Read, 10 Cir., 166 F.2d 551, 2 A.L.R.2d 1155;

Obold v. Obold, 82 U.S.App.D.C. 268, 163 F.2d 32; United States v. Gundelfinger, D.C.W.D.Pa., 102 F.Supp. 177.

4. By the time they were cross-examined, each of the doctors had clearly recognized

Again, the endeavor of the defense is to accomplish a biased selection of facts, presenting those favorable to the defendant and suppressing those unfavorable. Not only were his own experts denied information about the events in the tavern, but when Dr. Duval, a psychiatrist employed for the purpose by the Government, sought to interview him, he refused to discuss any of the events of the night of December 26–27, 1957 and was so uncooperative that Dr. Duval could form no opinion as to his mental condition at the time of the crimes. The absence of direct medical contradiction of the opinions ventured by Drs. Odenwald and Miller on direct examination is of no legal consequence because of the defendant's lack of open cooperation as well as because the expressed opinions could be tested by the jury in the light of their factual assumptions.

Next, the defendant complains of the receipt in evidence of the testimony of Lieutenant Barnes, of the West Palm Beach police. Its receipt is said to have been offensive to the rule of Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479.

Lt. Barnes testified that Carpenter was arrested by policemen of West Palm Beach at 9:38 o'clock in the evening. Lt. Barnes was summoned, and began talking with Carpenter at about 9:50. He says he fully informed Carpenter of his rights, and that Carpenter declined to give any statement about the homicides,[5] but did tell of his disposition of the pistol, his catching a ride in front of the police station in Boca Raton, and he talked of Overton and their flight. Because of the nature of the crimes, agents of the FBI were notified, and they arrived at the police station at approximately 10:30 o'clock. After talking with Lt. Barnes and with Carpenter, they became convinced of Carpenter's identity. Their superiors in Miami were skeptical, however, and it was not until approxi-

mately midnight that they obtained permission to take custody of Carpenter. Meanwhile FBI agents and local policemen, from time to time talked to Carpenter, and shortly after 12:00 o'clock midnight he was delivered into the custody of the federal agents. They carried him to Miami where he was arraigned at 10:00 o'clock the same morning.

■ In Mallory v. United States, supra, the Supreme Court required the suppression of a confession taken by federal agents after an unreasonable delay in the arraignment of the accused. It is a means of enforcement of the requirements of Rule 5(a) of the Federal Rules of Criminal Procedure, 18 U.S.C. A., which necessitates the arraignment, without unnecessary delay, of prisoners in federal custody. Earlier, federal statutes from which the requirements of Rule 5(a) were derived had been enforced in the same manner. McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819.

Federal rules and statutes governing the arraignment of persons in federal custody have no application, however, to the arraignment by state officials of state prisoners, unless, of course, the state officials are acting for, and under the direction of, federal agents under circumstances which fairly warrant the conclusion that the custody is federal in substance. Anderson v. United States, 318 U.S. 350, 63 S.Ct. 599, 87 L.Ed. 829; Papworth v. United States, 5 Cir., 256 F.2d 125.

The West Palm Beach Police Department had received "flyers" from the FBI, which contained descriptions of Overton and Carpenter and statements that they were wanted for arrest in connection with the homicides, kidnappings and thefts, some of which were state offenses as well as federal. Newspapers had given prominent treatment to the flight of Overton and Carpenter and to the

the relevance of the events in the tavern to the issue of mental responsibility.

**5.** Carpenter agreed that Lt. Barnes told him he did not have to give a statement about the occurrences in the tavern, but denied that he was informed of any other rights.

crimes they were thought to have committed. Carpenter, himself, had seen the headlines announcing the death of Overton and was well aware of the general police search for him.

The arresting officer was executing no federal warrant. As soon as he identified Carpenter, he arrested him, not because of any command of the FBI, but because he was believed to be a dangerous felon wanted for prosecution in other jurisdictions. The officer was neither under the control nor the direction of the FBI, and his custody was that of the state, which could not be converted into federal custody merely by reason of the prior receipt of the widely broadcast FBI flyer.

FBI officials were summoned and arrived at the West Palm Beach police station within an hour of the arrest. According to Lieutenant Barnes, the federal agents were not authorized to take custody of Carpenter, until they first satisfied themselves and their superiors in Miami there was no mistake in identity. This necessitated several telephone calls to Miami, but as soon as authorization was obtained, approximately 2½ hours after the arrest, Lieutenant Barnes surrendered Carpenter to federal custody. In the meanwhile, it seems plain that Carpenter was in the custody of state officials, not of federal agents.

 Most of the states have statutes designed to protect persons suspected of crime from coercive and abusive practices, and state denial of fundamental rights may require the exclusion of a confession as involuntary. Here, even if the Mallory rule were applicable, however, the delay in arraignment during the continuance of state custody seems neither undue nor unreasonable, under the circumstances. Indeed, it is not even suggested what other course Lieutenant Barnes might have pursued with greater propriety.

There was no evidence of any statement made by Carpenter after his transfer to federal custody, and we are not confronted with any contention that his arraignment was unnecessarily delayed thereafter.

Exception was taken to so much of the charge to the jury as informed them:

"Under the laws of the United States, ladies and gentlemen, whoever aids or abets another in the commission of an offense is punishable as if he were the principal in the offense. Moreover, if two persons act in concert with a common purpose or design to commit an unlawful act, then the act of one of them in furtherance of the unlawful act is in law considered the act of the other."

 Carpenter contends this portion of the charge, in effect, permitted the jury to find him guilty of a conspiracy, a crime for which he was not indicted. What the Court told the jury was a correct statement of the law, however. 18 U.S.C.A. § 2. It matters not that Overton or Carpenter was the first to seize control of the kidnap victims or their automobiles, or that one was driving at a particular time and the other was not. If they were acting in concert, each acting voluntarily in the pursuit of their joint purpose, each was responsible, not as a co-conspirator but as a principal, for the acts of the other. It was appropriate for the court to so inform the jury, and doing so did not permit the jury to find Carpenter guilty of a crime not charged in the indictment. Gooch v. United States, 10 Cir., 82 F.2d 534; Fritts v. United States, 10 Cir., 80 F.2d 644. And see Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489.

Finally, Carpenter objects that during his cross-examination, the prosecutor asked, on several occasions, if Carpenter would like to reconsider a specific answer in the light of the testimony of other witnesses. Upon objection, one such question was rephrased to state the testimony of the other witness in hypothetical form and, as rephrased, was allowed. The prosecutor did not persist in this form of questioning.

 The form of cross-examination and the manner in which it is con-

ducted are within a very broad discretion of the District Judge. Our examination of the printed record does not suggest to us that the few questions containing references to previous testimony were abusive; certainly we would be unjustified in concluding that there was an abuse of the District Judge's discretion when he allowed them. United States v. Buckner, 2 Cir., 108 F.2d 921; Iva Ikuko Toguri D'Aquino v. United States, 9 Cir., 192 F.2d 338.

Whether Carpenter acted as a result of his own volition or under compulsion was an issue of fact which the jury has resolved. There is no question of the sufficiency of the evidence to support the verdict. Our examination of the entire record has convinced us that the case was fairly tried, that every proper protection was given the defendant and that the District Judge, in his charge, properly and fairly submitted the case to the jury.

Affirmed.