**UNITED STATES of America, Appellee,**

v.

**William RUBIN, Defendant-Appellant.**

**No. 352, Docket 78–1221.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 8, 1978.

Decided Sept. 6, 1979.

MANSFIELD, Circuit Judge:

William Rubin appeals from a judgment of the District Court for the Southern District of New York, entered on June 30, 1978, by Judge Constance Baker Motley, *Judge,* after a fifteen-day jury trial, convicting him of conspiracy to violate a federal statute prohibiting the making of false statements in connection with a loan application, a loan renewal, deferral of action on a loan, or substitution of security for a loan, as well as federal statutes relating to mail fraud, wire fraud and securities fraud.[1]

Rubin and four others were named in a three-count indictment handed down on January 27, 1978. Count One charged all five with conspiracy as indicated above. Count Two charged Rubin and three of the others with a substantive violation of 18 U.S.C. § 1014, the false statement statute, and 18 U.S.C. § 2. Count Three charged Rubin and three of the others with a substantive violation of 15 U.S.C. § 77q(a), the securities fraud statute, and 18 U.S.C. § 2.[2]

Prior to trial the Government moved for a severance of Rubin's trial from the trials of the other defendants; the trial judge granted the motion and Rubin was tried first.[3] The jury found Rubin guilty on Count One but acquitted him on Count Three; the Government then moved to have Count Two dismissed, which was granted. Rubin was sentenced to three years in prison, but is free on bail pending disposition of this appeal. Although Rubin does not argue that there was insufficient evidence to support his conspiracy convic-

Louis Bender, New York City (Sandor Frankel, Bender & Frankel, New York City, of counsel), for defendant-appellant.

Rhea Kemble Neugarten, Asst. U. S. Atty., S. D. N. Y., New York City (Robert B. Fiske, Jr., U. S. Atty., Robert J. Jossen, Asst. U. S. Atty., S. D. N. Y., New York City, of counsel), for the U. S.

Before FRIENDLY, MANSFIELD and MESKILL, Circuit Judges.

---

1. Respectively: 18 U.S.C. §§ 1014, 1341, 1343, 2; 15 U.S.C. § 77q(a). The indictment originally charged a conspiracy to violate 15 U.S.C. § 77e as well but this was deleted from the indictment before the case was submitted to the jury.

2. Peter Crosby, Otto Sebold, Leonard James and C. W. Deaton were the other four named in the indictment. Crosby was not named in Count Two; Sebold was not named in Count Three.

3. Trial of three of the other defendants began before Judge Motley in May of 1978 and concluded a month later. Crosby was acquitted on both of the counts in which he had been named; Sebold and James were found guilty of conspiracy and one of the substantive counts. Deaton was never tried. The charges set forth in the indictment against him were not the subject of the extradition order by which his presence in the United States had been obtained. As to him, Judge Motley granted the government's application for an order of nolle prosequi. James and Sebold have appealed their convictions to this Court, # 78–1346, 609 F.2d 36 and their appeal is presently sub judice.

tion, he does raise a variety of other legal claims in support of a dismissal of the indictment or a new trial. Finding no merit in these contentions, we affirm.

The present case arises out of the activities in late 1972 and 1973 of Rubin, Leonard James, C. W. Deaton and Otto Sebold in fraudulently obtaining financing from the Bankers Trust Company and others for a failing company, Tri-State Energy, Inc. (Tri-State). The methods employed to obtain the funds included use of material misrepresentations, false documentation, worthless collateral, and bribery. Prior to becoming associated with Tri-State and with James and Deaton, who were its principal officers, Rubin, a certified public accountant and law school graduate, was a principal in North American Planning Corporation (NAPC), a brokerage firm. In June, 1972, Rubin borrowed 10,000 shares of All States Life Insurance Company of Alabama from Tri-State on Deaton's representation that the shares were freely tradeable, only to find that they were restricted and unacceptable as collateral, which led to NAPC's demise. Left without a job, Rubin, though put on notice of the fraudulent business methods used by James and Deaton, became associated with them in Tri-State[4] in the fall of 1972, and soon embarked upon the fraudulent scheme which led to the indictment in the present case.

Tri-State had recently acquired a small coal mine in Kentucky, which operated very briefly in the latter part of 1972.[5] The mining properties were used by James and Deaton as a means of obtaining loans from Bankers Trust by falsely representing that they were a viable coal operation. In addition, Tri-State acquired control of other virtually worthless publicly-owned companies, such as American Leisure Corporation, with a view to giving the appearance, on paper at least, of a thriving enterprise. Rubin's function, aside from obtaining some initial small loans from friends for the venture and negotiating some of the acquisitions, was to dress up Tri-State's financial statement in order to give it the false appearance of a company with a substantial net worth that would generate attractive profits in the future.

In October, 1972, Rubin and Deaton (possibly accompanied by James), approached Leonard Ludwig, a branch manager of Bankers Trust Company, with whom Rubin had had dealings before joining Tri-State, to seek a loan for Tri-State. Ludwig refused a loan on the ground that the bank first needed evidence that Tri-State was a viable coal operation. Deaton, James and Rubin responded by preparing various materially false documents, including a financial statement regarding Tri-State's operations and conditions.

A second meeting with Ludwig on October 19, 1972, resulted in his agreeing to make a loan of $50,000 and to discuss additional loans after he had seen more Tri-State financials. Ludwig then obtained approval of the loan from John Keating, another official of the bank, as required by the bank's rules.

At either their first or second visit with Ludwig, Rubin and Deaton told Ludwig that if he took care of Tri-State it in turn would take care of him. After the second visit Rubin, Deaton, and James agreed that a payment of $1500 should be made immediately to Ludwig, to be followed by more at a later time. To accomplish this, Deaton gave Rubin a $1500 Tri-State check payable to cash which Rubin cashed at his country club. Rubin then gave the $1500 in cash to Ludwig, adding that more money would follow. True to his word, Rubin later gave Ludwig an additional $2500 in cash at a meeting in a bar. At Ludwig's suggestion, Rubin also made two payments of $500 cash each to Keating, one by placing the money in Keating's pocket in the men's room at his

---

4. Rubin was not given a stock interest in the company. Instead, he was to receive a salary, bonuses, and 20% of the profits. James was president of the company, and Deaton was called secretary-treasurer. In reality, Deaton appears to have been the "de facto chief executive officer" of the corporation.

5. The mine was under the supervision of Deaton's brothers, Jack and Robert.

Bankers Trust branch and the other in an envelope at the bank.

In addition to the loan of $50,000 which was obtained on October 19, 1972, Rubin and Deaton were able during the following six weeks to borrow $425,000 from Bankers Trust. On November 22, Tri-State renewed the original $50,000 loan for three months and borrowed another $50,000. Eight days later, Tri-State borrowed another $100,000 for three months. After another six days, Tri-State borrowed still another $275,000, also for three months.

In addition to their use of bribery of the bank's officers, Rubin, James and Deaton also used materially false financial documentation and bogus collateral to secure approval of the loans and later to prevent the bank from taking action that would precipitate Tri-State's collapse. In response to Ludwig's earlier request, a financial statement was submitted to the bank, which was materially false in several respects. For example, it listed as Tri-State's principal asset a $7.5 million receivable from a company by the name of Charter Financial, supposedly resulting from a coal purchase by that company. There was no such account receivable.[6] The statement also showed that Tri-State had over $250,000 in cash. Of this cash amount, $200,000 was in fact attributable to two undeposited, uncashed checks drawn by one Raymond Starns on his personal checking account and in the possession of Tri-State. The financial statement also reflected $180,000 worth of coal inventories. In fact, Tri-State had far less.

The October 20th statement had initially been prepared by an outside accountant named Max Englander. Englander's original draft balance sheet showed the Charter Financial contract as an asset but failed to show any liability. Rubin corrected this by offsetting the "asset" with a liability for income taxes of $3.75 million. Englander's draft also had itemized the company's available cash, dividing it into $200,000 cash on hand and a little over $50,000 in various banks; the draft identified the $200,000 as consisting of the two checks written by Raymond Starns. Rubin "corrected" these entries by consolidating them and eliminating reference to the Starns checks. Rubin made no change relating to the coal inventory, but there was evidence from which the jury could infer that he knew at the time that the Kentucky mine was only minimally operational and that the coal inventory figure was overstated. Englander testified that, after Rubin had made his corrections, Deaton instructed him to make additional changes so as to increase the company's net worth above what it would have been using Rubin's computations. It is the Government's position that, although the copy of the statement that Rubin worked on was not the one ultimately turned over to the bank, Rubin's work on the statement made the Charter Financial asset appear more regular than it really was and eliminated the possibility of the bank's becoming suspicious about the company's available cash.[7]

6. There did exist a *conditional* contract between Tri-State and Charter Financial, and it was in fact signed by Charter Financial's president, Stanton Kahm. But that was not the contract shown to the bank. To the contrary, a signed, unconditional contract between the two companies was offered to the bank. Kahm's signature on that contract was forged.

7. Besides this financial statement, Tri-State presented Bankers Trust with a written projection of Tri-State's revenue, a document which Keating and Rubin apparently discussed and which Keating used as support for his decisions to approve the loans. This document projected a gross income of $540,000 based on anticipated sales of coal to companies by the name of Continental Coal Corporation and Re-

poca Resources and on a long-term export contract with a German firm by the name of Roland Werkstatten. In fact, there had never been any discussions with Repoca, and the contract with the German firm was a sham, having been prepared by Rubin's co-defendant Otto Sebold, a representative of the German firm who used office space at Tri-State. From all of the surrounding circumstances the jury could infer that Rubin knew that the revenue projection was false and misleading.

In addition, Rubin furnished to the bank a map overstating Tri-State's coal reserves, a forged letter of intent from Repoca, and a statement valuing Tri-State's coal reserves at $3 per ton in place when the actual value of such coal was only $1 per ton.

From the beginning of its relationship with Tri-State, Bankers Trust had made it clear that any loans must be collateralized. As collateral Tri-State turned over to the bank a certificate for 400,000 shares of American Leisure stock, which was in Tri-State's name, unregistered, and bore a restrictive legend. Keating recognized that unregistered stock was of doubtful value as collateral in the event of default and told Tri-State that he would accept the stock but preferred marketable collateral. He was then assured by Rubin and Deaton that Tri-State would present such collateral and was promised that the restriction on the American Leisure stock would be removed.

Between October of 1972 and January of 1973 Tri-State pledged the stock of several other companies as collateral, including stock in All States.[8] The stock was represented to Keating to be marketable, owned by Tri-State and to have been obtained through the sale of coal rights to the Kentucky mine. In fact, as Rubin knew, most of the collateral was not owned by Tri-State but had been "rented" by it for a fee. Moreover, the shares were virtually worthless, since none of them were freely tradeable, five of the stocks had never been registered, the sixth had not been registered since 1944, and the American League shares bore a restrictive legend. Rubin had participated in attempting to establish a misleading value for the All States shares by having the stock placed in the over-the-counter "pink sheets" by a friend in a brokerage house, Marshall Murray & Co. The stock, however, was virtually never traded during the four-month period from October, 1972, to February, 1973, when it was so carried.

Each of the notes signed by Tri-State and given to Bankers Trust for the loans contained conditions which made them collectible before maturity if any representation in connection with the loans proved to be "untrue or incomplete," if there was an "adverse change" in Tri-State's condition, or if a legal proceeding should be commenced against Tri-State by a judgment creditor. As Tri-State began to sag its principals reassured the bank that all was well. These reassurances were quite plainly untrue. In December of 1972 the Tri-State payroll checks for the Kentucky mine began to bounce; by Christmas the mine was closed and the Deaton brothers had left town. By early January the company was dishonoring checks throughout its operation. In one way or another, these developments came to the bank's attention.

Beginning in January or February of 1973, Keating had the bank's credit department check into the various items of collateral that had been pledged by Tri-State as support for the loans. He also began to make sure that the bank had sufficient documentation on the collateral to support a foreclosure if that turned out to be necessary. Buttressed by reassurances from Tri-State that the company was not only in no financial difficulty but was in fact prospering, and despite all the bad news that seemed to swarm around the Tri-State transactions, Keating decided that the best way to prevent a loss to the bank, as well as to save himself from a potentially embarrassing situation, was to consolidate the four outstanding time loans into a single demand note at a higher interest rate. On February 26, 1973, amid continuing assurances by Rubin, Deaton and James as to Tri-State's prosperity, a demand note was executed by James on behalf of Tri-State. The loans were not called.

Two days later the bank received an inquiry from the United States Justice Department asking for information about Tri-State. On March 5 the bank demanded full payment within three days. This demand went both unpaid and unenforced and on May 14, 1973, Deaton met with several people from the bank in an effort to forestall

---

8. The following additional stocks were pledged with Bankers Trust on the dates indicated:

2,000 shrs All States 11/10/72

20,000 shrs Marlin Investment Company, 11/22/72

100,000 shrs Management Dynamics, Inc., 12/6/72 (returned to Tri-State a few days later)

175,000 shrs General Investment Corp., 12/10/72

50,000 shrs Satellite Systems Corp., 1/19/73

All shares were pledged as collateral for each of the loans.

payment of the note. Deaton even asked for an additional loan, to be used to develop Tri-State's assets to the point of being able to pay off the note. The bank declined and initiated a lawsuit against Tri-State. Subsequently, Rubin signed a confession of judgment against himself but he then filed a petition in bankruptcy. In all, the bank has recovered about $2,500 of the $475,000 (plus interest and expenses) due from Tri-State.

The Government investigation led to its interrogation of Rubin, beginning in July 1973. Rubin was told of the nature of the Government's investigation, was advised to obtain counsel, and was asked to consider cooperating with the Government by furnishing evidence against his co-conspirators on the informal understanding that the Government was "not going to let him walk away" but would consent to his pleading guilty to one felony count. Rubin decided to cooperate, after consulting his counsel, with whom he appeared in July, 1973, whereupon he was advised of his constitutional rights and interrogated in his counsel's presence. From July 1973 to July 1976, Rubin was interviewed approximately 13 times by various Government agents (including Edward J. Levitt) and attorneys. No written statement was taken from him but some of the agents took extensive notes during the interviews, cryptically summarizing the substance of what Rubin recounted, with quotes here and there. These notes, totalling more than 70 pages, were later marked Government Exhibit (GX) 66 for identification at the trial of Rubin. Since Rubin was at the time of the interviews a cooperating prospective defendant expected to plead guilty, no effort was made to obtain his signature to or his formal approval of the notes. As time went on, however, Rubin ceased cooperating with the Government and decided to stand trial, apparently after he was unsuccessful in renegotiating his arrangement with the prosecution to one whereby he would be granted immunity in lieu of pleading guilty to one felony count.

On January 27, 1978, an indictment was filed in the District Court for the Southern District of New York, naming Rubin and various co-conspirators, including James, Deaton, Otto Sebold, and Peter Crosby. Upon the Government's motion a severance of Rubin from his co-defendants was granted for the reason that his pre-trial interview statements, which the Government proposed to introduce, would create problems under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), as to his co-defendants. At the trial of Rubin the Government, as part of its direct case, introduced testimony of various witnesses, including Ludwig, Keating, Englander, Levitt and government agents. One of the principal witnesses was Internal Revenue Agent Thomas Cox, who was present at 12 of the 13 interviews of Rubin and testified to Rubin's detailed incriminating account of the Tri-State fraud upon Bankers Trust. In his defense, Rubin took the witness stand and called various witnesses in an effort to show that he had not intended to use Tri-State as an instrument of fraud, but had acted in a good faith effort to promote Tri-State as a viable business.

## DISCUSSION

### *Admission of Agent's Interview Notes*

Rubin's most serious claim is that the trial judge committed reversible error in admitting into evidence, upon the Government's redirect examination of Agent Thomas Cox, a few of the more than 70 pages of notes made by other government agents present at the preindictment interviews of Rubin, after Cox had used them on his direct examination to refresh his recollection and Rubin's counsel had used them extensively on his cross-examination of Cox. Although Cox had not personally made the notes, he had been present at the interviews recorded in the notes, had participated in the interrogation of Rubin, examined the notes at the conclusion of each interview and testified that the notes accurately re-

flected what had been said at the interviews attended by Cox. Thus Cox, in effect, adopted the notes as his own.

Upon direct examination, Cox testified to Rubin's incriminating history of his becoming associated with James and Deaton in Tri-State, the poor state of Tri-State's business and finances, their fraudulent negotiation of the loans from Bankers Trust to Tri-State, the bribery of Ludwig and Keating, and their preparation and use of false Tri-State financial statements, other false documentation and bogus collateral to obtain the loans and lull the bank into taking no action to call the loans.

In a prolonged and somewhat confusing cross-examination of Cox, Rubin's counsel, Louis Bender, though he had repeatedly objected to Cox's direct testimony on the ground that it was based on the agent's interview notes rather than on his own independent recollection, now adopted the strategy of using the notes extensively in an effort to show that Cox's present testimony was either inconsistent with the notes or not supported by them. In pursuing this line of inquiry Bender, although the interview notes were not in evidence, frequently read verbatim excerpts which, when taken out of context, tended to indicate that Rubin's interview admissions had not been as incriminating as those attributed to him by Cox and then elicited from Cox a confirmation that Bender had accurately quoted the portions so read by him to the witness. (See e. g. Tr. 762, 767–68, 784, 798, 800, 801, 807, 811, 816–17, 819, 820, 852, 864, 867, 872). When a suggestion was made by the prosecutor and the Court that if Bender was going to continue reading from the notes perhaps they should be introduced as evidence, Bender demurred, claiming a right "to read a prior inconsistent statement, if it is." Tr. 763. Although it was then agreed that the notes would be so used only with respect to matters as to which Cox had relied upon them rather than on his independent recollection, Tr. 764–65, Bender continued to quote from the notes as he had done previously.

Some examples of the foregoing attempted impeachment of Cox's credibility are found in the cross-examination of him with respect to (1) whether James had attended the first meeting with Ludwig at Banker's Trust at which Rubin and Deaton sought a loan to Tri-State, Tr. 758–59, (2) whether Rubin told Ludwig that he would be taken care of if the loan were approved, Tr. 768–69, and (3) whether Rubin had known in October, 1972, that Raymond Starns, whose undeposited checks for $200,000 were carried as "cash" on the Tri-State's October 20, 1972, financial statement used to obtain some of the loans, had been imprisoned on certain charges. Tr. 784. With respect to most of these matters Bender quoted portions of the interview notes that appeared possibly to be inconsistent with testimony given by Cox on direct, thus furnishing the jury with these portions. For instance, Cox on direct attributed to Rubin an admission that at his first meeting with Ludwig, Rubin had said to Ludwig, "Look, Ray, if you can see your way clear to help us, we will take care of you." Tr. 667. On cross Bender pointed out that while the interview notes contained the statements in quotes "If you take care of us we will take care of you" they were followed by the notation, not in quotes, "No—Don't know," Tr. 767–69. Cox could not recall Rubin's making the latter statement. Bender's purpose in bringing it out, however, was manifest: to cast doubt on Cox's veracity.

Turning to the four exhibits forming the basis of appellant's present claims (GX 66A, 66B, 66C, and 66D) the first, 66A, consisting of two pages, represents a portion of Agent Levitt's notes of an October 10, 1974 interview of Rubin in which he recounted events immediately following Ludwig's meeting on October 20, 1972, with Rubin, Deaton and James at the bank, at which Ludwig approved the first $50,000 loan to Tri-State. The notes start with the word "Pay-off" and then describe the discussions between Rubin, Deaton and James, their decision to pay Ludwig $1500 immediately, the drawing of the check in that amount to cash, the cashing of the check by Rubin, his payment of the proceeds to Ludwig and his report to

Deaton and James. The detailed notes appear completely consistent with Cox's testimony on direct. However, on cross, before the notes were offered, Bender pointed out to Cox that he could not say whether Rubin had used the word "Pay-off" in the interview, although Rubin did state that he had given the money to Ludwig.

Upon redirect the Government offered GX 66A as a "prior consistent statement" by Cox regarding what he had been told by Rubin at the October 10, 1974, interview, to which Rubin objected on the grounds that the notes were not what Rubin had said but the agents' characterization of what Rubin had said and that the notes should in any event be introduced through the agent who made the notes (Levitt) rather than through Cox. These objections were overruled. The excerpt from the notes was received and read to the jury.

The next exhibit objected to on this appeal, GX 66B, is a typed excerpt from notes of a February 14, 1975, interview of Rubin in which he discussed the Tri-State $7.5 million receivable from Charter Financial which had been included as an asset, supposedly resulting from a coal purchase by that company from Tri-State, in the latter's false financial statement submitted by Rubin to Keating of Bankers Trust in support of Tri-State's application for a loan. When checking the balance sheet, Rubin had told Englander of Tri-State to include a liability for income taxes of $3,750,000. The Government's theory at trial was that Rubin knew that the listing of the Charter Financial asset was fraudulent (as indeed it was) and that his suggestion that a liability be included on the balance sheet operated to make the asset look more "regular," thus preventing the bank from becoming suspicious.

On direct, Cox testified that Rubin had said during the interview that the "assets involved in [the balance sheet] were worthless, and he knew it," Tr. 672, and that "[a]t the time he was given this balance sheet to approve or to comment on he knew that that balance sheet was totally false," Tr. 673. Cox also referred to Rubin's putting

in the tax liability, but said it had not been put in against any particular asset. Tr. 668. He testified that the only matters Rubin had talked about relating to the balance sheet and the value of the assets were "those two items," meaning the Raymond Starns' checks totalling $200,000, Tr. 674, and that the only contracts that Rubin had talked about were contracts that had been purportedly made with German concerns. There was no reference to the Charter Financial contract.

On cross Cox, in response to questions by Bender about the Charter Financial "contract," testified that it had been brought up at one of the interviews at which he was present but that he (Cox) had not been "too interested in it," Tr. 809, and that Rubin had indicated that he was not deeply involved with Charter Financial. Tr. 809–10.

On redirect the Government introduced as GX 66B the third paragraph of page 3 of the typed notes of the February 14, 1975, interview of Rubin "as a prior consistent statement of the witness," Tr. 885, which reads:

Deaton did enter into one deal with Charter Financial whose representative was Stanley Kamm of Milwaukee, Wisc. Apparently there was some sort of guarantee of the Home Insurance Co. on Maiden Lane attached to the executory contract which Tri-State had in its files. The contract was not executed, but was signed by Mr. Kamm. Also Kamm had previously done some business had some connection with Mortgage Guaranty of Milwaukee, MAGIC.

When Bender objected on the ground that the witness had not given any testimony contradicting the agent's notes, the prosecutor argued the excerpt was admissible "to show Mr. Rubin's state of mind," whereupon it was admitted and read to the jury.

GX 66C is an excerpt from the agents' notes of a January 9, 1975, interview of Rubin dealing with his statement regarding Raymond Starns, who had written two $100,000 checks that were turned over to Tri-State and, although not cashed by it, were carried by it as "cash" on the October

20, 1972, Tri-State false financial statement used by Rubin to obtain the bank loans. The original draft of the balance sheet showed the cash entry as being represented by the two Starns checks in Tri-State's possession. However, Rubin changed the cash entry by consolidating the cash amount and eliminating reference to the Starns checks.

Cox testified as follows as to Rubin's explanation for the change in the balance sheet: "He made a comment about the two checks because Raymond Starns who wrote these two checks in blank that were never negotiated, Rubin knew that he had served time in a penitentiary for passing bad checks." Tr. 669. Bender immediately objected to Cox's use of the word "knew," arguing that Cox was implying that Rubin had known at the time of his work on the balance sheet that Starns had spent time in jail for passing bad checks. Bender's point was that, at most, Rubin had said that he knew at the time of the interview that Starns had been imprisoned on such charges. Cox insisted, however, that Rubin had said at the interview that he knew at the time of working on the balance sheet that the checks by Starns were probably worthless because he knew at that time that Starns had been in jail for passing bad checks. Tr. 669–74, 784.

On cross-examination, Bender read to Cox the following excerpt from the interview notes dated February 14, 1975: "According to Rubin, Raymond Starns is now in jail in New Orleans, possibly a bad check charge." Tr. 784. Cox then acknowledged that the term "now" in the excerpt referred to the date of the interview and not to the time when the balance sheet was prepared or the financial statement was offered to the bank. Tr. 784. Cox steadfastly maintained, however, that the October 14 note was not inconsistent with his earlier testimony regarding Rubin's knowledge of Starns' imprisonment. After a recess, Cox said that he could not find anything in the interview notes to support his version of Rubin's knowledge, but he did refer to page 12 of the notes dated January 9, 1975, and mistakenly conceded that that page was the one read to him by Bender and the only

place in the notes where there was reference to Rubin's comments on Starns' jailing.

The Government took advantage of this discrepancy on redirect, suggesting that on January 9 Rubin had not said that Starns *was then* in jail for passing bad checks but that Starns *had been* jailed on such charges. Cox agreed with this interpretation. The Government then offered the January 9 notes into evidence "as a prior consistent statement of the witness." Tr. 890. Bender did not object, the exhibit was received into evidence, and Cox read the entry to the jury. GX 66C states:

Raymond Starns—2 check—? Starns & Deaton—old friends—Raymond Starns gave Deaton mine. Jail—New Orleans—bad Checks—Salt Lake.

GX 66D, two pages of agents' handwritten notes of an interview of Rubin on March 28, 1975, relates to Rubin's purchases of All States stock, allegedly made on behalf of Tri-State in order to establish a public record that would convince the bank that All States collateral was valuable. Bankers Trust, in evaluating over-the-counter stock that was offered as collateral, consulted the price of the stock as listed in the "pink sheets" published by the National Daily Quotation Service. All States had not been listed in the pink sheets since September 27, 1972, and, accordingly, would not be viewed by the bank as valuable collateral. To remedy this situation, Deaton told Rubin to write a personal check to the Marshall Murray & Co. stock brokerage firm for the purchase of 100 All States shares. The stock was to be ordered in Rubin's, not Tri-State's, name; Rubin was reimbursed out of Tri-State's funds. The effect of this transaction was that All States appeared in the pink sheets during the time that the loans were being sought and "collateralized." Rubin acknowledged making the purchase, but denied doing so in order to bring up the pink sheet price.

On direct, Cox testified that Rubin had described this series of transactions during one of the interviews. On cross, Bender

brought out the fact that Deaton was the one who had had a conversation with Marshall Murray & Co. regarding the pink sheets, and that he (Cox) had only assumed that Rubin was present during that conversation. On redirect, the Government introduced the two pages of hand-written notes "as a prior consistent statement on the subject of pink sheets." Tr. 895. Bender objected that no inconsistencies had been developed on cross; the Government responded that doubts may have been raised on cross regarding Rubin's intent and knowledge. The notes were admitted and read to the jury.

Rubin does not dispute the relevance of the agents' notes (GX 66A–D) to the issues in the case. However, relying upon our recent decisions in *United States v. Check*, 582 F.2d 668 (2d Cir. 1978) and *United States v. Quinto*, 582 F.2d 224 (2d Cir. 1978), he contends that they are inadmissible hearsay, whether offered as prior consistent statements to rehabilitate the witness Cox or to prove the facts stated, and that their admission was highly prejudicial to Rubin since the notes dealt with the main issue raised by his defense, which was whether Rubin intended his payments to Ludwig and Keating to be bribes or merely gifts that were not designed to influence their approval of the loans to Tri-State.

Rubin argues that the excerpts from the notes should have been excluded for the reason that the Government failed to satisfy the three conditions precedent to admission of prior consistent statements specified by us in *Quinto, supra,* 582 F.2d at 233–234: (1) that the prior statement be consistent with the witness' in-court testimony (2) that the prior statement be "offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive," Fed.R.Evid. 801(d)(1)(B), and (3) that the statements have been made prior to the time when the motive to fabricate arose. If Cox's adopted prior statements had been offered as substantive evidence under Fed.R.Evid. 801(d)(1)(B), the Government would undoubtedly have been obligated to meet these conditions. Whether or not some lesser standard would be required

if the prior statements had been offered merely to bolster Cox's credibility as a witness may be debated, as our esteemed brother, Judge Friendly, forcefully explains, notwithstanding our indication in *Quinto* that the standards for use of such statements for rehabilitative purposes should be the same as those under Fed.R. Evid. 801(d)(1)(B), 582 F.2d at 233. It is true that prior to the adoption of the Federal Rules of Evidence we had taken a more lenient and flexible attitude toward use of prior consistent statements for rehabilitation purposes. *See, e. g., United States v. Lombardi,* 550 F.2d 827 (2d Cir. 1977); *Applebaum v. American Export Isbrandtsen Lines,* 472 F.2d 56, 60–62 (2d Cir. 1972). If the agents' notes in this case had been admitted on that limited basis, the trial judge would have been required if requested by Rubin to instruct the jury as to the limited purpose for which they were received, i. e., as bearing on Cox's credibility and not as substantive evidence, *United States v. Di Lorenzo,* 429 F.2d 216, 220 (2d Cir. 1970), *cert. denied* 402 U.S. 950, 91 S.Ct. 1609, 29 L.Ed.2d 120 (1971). However, we consider it unnecessary to resolve that issue in this case for the reason that the admission of the excerpts from Cox's adopted notes must in any event be sustained on other grounds.

 Since the record reveals no objection by defense counsel to the admission of GX 66C, which dealt with the Starns checks and the time when Rubin knew of Starns' imprisonment on a bad check charge, Rubin is precluded from raising the issue on appeal. As for GX 66A, which used the term "Pay-off," to which Rubin now objects on hearsay grounds, we note that it was Rubin's own counsel who first read the word "Pay-off" from the exhibit to the jury upon his cross-examination of Cox, so that the jury was fully aware that the exhibit bore the damning word even before GX 66A was introduced. If this did not waive any objection it at least served to mitigate or eliminate any prejudice caused by the use of the word in the exhibit as later received. Aside from this opening of the door, defense coun-

sel at no time objected to the receipt of GX 66A on the hearsay grounds urged on appeal. The sole grounds urged by him were that the exhibit contained the agents' characterizations of what Rubin had said rather than Rubin's words and that the proper witness through whom to offer the exhibit was the agent who made the notes (Levitt) rather than Cox.[9]

■ Neither of these specific objections is sustainable. Since Cox had, immediately following the interview of Rubin, adopted the notes as accurate and in accord with his own recollection, they could be properly treated as a prior consistent statement made by him.[10] Assuming the notes were otherwise not objected to, the claim that they represented "characterizations" of what Rubin had said would go to their weight rather than to their admissibility.

■ In short, defense counsel registered two specific objections to the exhibit, neither of which was valid. When the Government then sought to support the offer as a "prior consistent statement" there was no objection by defense counsel that the Government had failed to show a claim by Rubin of recent fabrication or improper influence or motive on Cox's part, or that the statement had been made prior to such a motive. Nor was there any answer to the prosecutor's argument to the trial judge that since Bender had sought to attack Cox's credibility by quoting "specific inconsistencies" and going to "peripheral matters" the exhibit should be received in the interest of completeness, i. e., in order to preclude Bender's later arguing to the jury that his quotations from the exhibit were "illustrative of the whole."

Rule 103(a) of the Federal Rules of Evidence provides in relevant part as follows:

Error may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected, and . . . a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context . . . . .

The reason for such a rule has been aptly summarized:

The initiative in excluding improper evidence is left entirely to the opponent,—so far at least as concerns his right to appeal on that ground to another tribunal. The judge may of his own motion deal with offered evidence; but for all subsequent purposes it must appear that the opponent invoked some rule of Evidence. A rule of Evidence not invoked is *waived.*

. . . . .

The function of the objection is, first, to signify that there is an issue of law, and, secondly, to give notice of the terms of the issue.

. . . . .

The cardinal principle (no sooner repeated by Courts than ignored by counsel) is that a *general objection, if overruled,* cannot avail the objector on appeal.

. . . . .

The only modification of this broad rule is that if on the face of the evidence, in its relation to the rest of the case, there appears *no purpose whatever* for which it could have been admissible, then a *general objection,* though *overruled,* will be deemed to have been sufficient.

. . . . .

A specific objection *overruled* will be effective to the extent of the grounds

---

**9.** Actually Levitt, now an attorney in the Department of Justice, did testify later as a Government witness.

**10.** Bender's objection that the notes were not Cox's statements was not implausible when made. When Bender first tried to read from the notes, the Government objected on the· ground that the notes should be put in evidence if Bender was going to read them. Bender

responded that he was only using the notes as prior inconsistent statements to impeach Cox's testimony. Judge Motley ruled that he could not so use the notes because they were not Cox's statements but statements of someone else which could not be attributed to Cox. Tr. at 763–64. At a later point Judge Motley after hearing further testimony and argument, revised this ruling.

specified, and no further. An objection *overruled,* therefore, naming a ground which is untenable, cannot be availed of because there was *another and tenable ground which might have been named* but was not.

1 *Wigmore on Evidence* § 18, at 321–22, 332, 336, 339–40 (emphasis in original; footnotes omitted). *See also* McCormick, *Law of Evidence* § 52 (2d ed. 1972); 21 Wright & Graham, *Federal Practice and Procedure: Evidence* §§ 5031 *et seq.*

On a number of occasions we have spoken of the importance of this rule and the strictness with which it should ordinarily be applied. *See, e. g., United States v. Maultasch,* 596 F.2d 19, 24 (2d Cir. 1979) (in the absence of an "objection that clearly stated the specific ground now asserted on appeal" the claim of error is "unavailing"); *United States v. Moore,* 571 F.2d 76, 88 (2d Cir. 1978); *United States v. Del Llano,* 354 F.2d 844, 847 (2d Cir. 1965) (*en banc*); *United States v. Indiviglio,* 352 F.2d 276 (2d Cir. 1965) (*en banc*), *cert. denied,* 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966).

█ Regardless of Rubin's failure to object on any proper grounds, there remains the question of whether the receipt of the notes should be treated as "plain error." *See* Fed.R.Crim.P. 52(b); Fed.R.Evid. 103(d); *United States v. Check, supra,* 582 F.2d at 676–78 & n. 28. Compare *United States v. Moore, supra,* 571 F.2d at 88–89, with *United States v. Indiviglio, supra,* 352 F.2d at 280–81. We believe not. On the contrary, GX 66A appears to have been clearly admissible under the doctrine of completeness, Fed.R.Evid. 106. The notes had been used extensively and quoted from copiously by Rubin's counsel on his cross-examination of Cox, possibly leaving a confusing or misleading impression that the portions quoted out of context were typical of the balance. In offering as a "prior consistent statement" the context from which Bender had quoted, the prosecutor was in reality urging that the entire context would remove the misleading or confusing impression created by the words quoted by Bender, which Rubin might otherwise point to as "illustrative of the whole." Tr. at 879. This amounted to an invocation of the completeness doctrine.

█ We have repeatedly recognized that where substantial parts of a prior statement are used in cross-examination of a witness, fairness dictates that the balance be received so that the jury will not be misled, *United States v. Lev,* 276 F.2d 605, 608 (2d Cir. 1959), *cert. denied,* 363 U.S. 812, 80 S.Ct. 1248, 4 L.Ed.2d 1153 (1960); *United States v. Weinbren,* 121 F.2d 826, 828–29 (2d Cir. 1941); *see generally* 7 Wigmore, *supra,* at §§ 2113–2125; Wright & Graham, *supra,* at §§ 5072, 5075, regardless of whether an improper motive existed at or after the prior statement, *see United States v. Fayette,* 388 F.2d 728, 733–35 (2d Cir. 1968); *United States v. Corrigan,* 168 F.2d 641, 645 (2d Cir. 1948). In this case the context introduced by the prosecutor in the interest of completeness was carefully restricted in scope, being limited to but a few of the 70-odd pages of notes. We are satisfied that these few pages were properly admitted.

Lastly, even if the admission of the excerpts of notes in GX 66A were treated as error, the error would be harmless. The prejudice claimed by Rubin from GX 66A is its use of the word "Pay-off." However, Rubin's counsel had, in his cross-examination of Cox, opened the door when he asked "For example, you have in the notes there [GX 66A] the word 'payoff.' Did Mr. Rubin ever tell any of you that he made a pay-off?" Thus the jury was made aware by Rubin himself that the notes described him as saying that there had been what amounted to a payoff of Ludwig. This was confirmed not only by Cox's testimony but by the balance of the context in which the word was used. Thus the introduction of the notes added little to what the jury already knew.

█ GX 66B, the agents' one-paragraph note dealing with Rubin's knowledge about the unexecuted contract between Tri-State and Charter Financial, and GX 66D, two pages of notes pertaining to Rubin's partici-

pation in the manipulation through Marshall of the OTC pink sheet quotations for All State stock, stand on a somewhat different footing. Prior to their being offered by the Government, there had been no effort by Rubin on cross-examination of Cox to show that they were in any way inconsistent with his direct testimony. They therefore represent prior Cox-adopted statements of what he had been told by Rubin. Rubin's objections to their admission, principally on the ground that no inconsistency had been shown, were rejected. Although these notes are hearsay and if objected to on that ground should not have been admitted, we are satisfied after a careful examination of them that the error was harmless. The substance of GX 66B was peripheral; that in GX 66D was entirely consistent with Cox's detailed testimony on the subject of Rubin's participation in the listing of All States stock in the "pink sheets" by Marshall Murray & Co. Indeed, they even include the statement that "Rubin did not ask Marshall to go into sheet on Allstate." None of the excerpts received in evidence (GX 66A–D), singly or collectively, approximate "a neat condensation of the government's whole case", *United States v. Ware*, 247 F.2d 698, 700–701 (7th Cir. 1957), or a detailed summary of the Government's evidence, amounting to "the single most important piece of evidence, testimonial or documentary" against the defendant, *United States v. Quinto, supra,* 582 F.2d at 235–36. We can safely say that the few pages of cryptic phrases in this case could not have had any appreciable effect on the jury, in view of the detailed testimony of the Government agents themselves regarding what they were told by Rubin. See *United States v. Ruffin,* 575 F.2d 346, 359 (2d Cir. 1978).

■ Rubin's only other evidentiary claim is that the trial court erred in admitting testimony by Keating that in February, 1973, he was told by Rubin and Deaton that they had applied to a New Jersey bank for a loan that would enable Tri-State to pay its obligations to Bankers Trust but that the New Jersey banker was demanding a bribe. Rubin contends that this testimony was both hearsay and inadmissible as a similar criminal act. *See* Fed.R.Evid. 404(b). We disagree. The statements were admissible as statements made by the conspirators in furtherance of the conspiracy, Fed.R.Evid. 801(d)(2)(E), one objective of which was to lull Bankers Trust into the belief that Tri-State was in good financial condition and would pay its obligation to the bank. Moreover, the New Jersey banker's demand for a bribe did not imply any improper or criminal conduct on Rubin's part.

*The Instructions*

■ We find no merit in Rubin's further contention that the trial judge committed reversible error in her instructions to the jury. It was not improper to instruct the jury that it is a crime for a banker such as Ludwig or Keating to receive a free gift for procuring a loan, or for one to aid and abet such conduct. This was a correct statement of the law, 18 U.S.C. § 215, and was appropriate in view of Rubin's repeated efforts during the trial to suggest that a banker's receipt of gifts from a borrower was customary and proper, but that the Government was using the threat of criminal prosecution to put pressure on Keating as a witness to testify against Rubin. The court properly advised the jury that it could consider the payments as evidence regarding the means for carrying out the alleged conspiracy and whether Keating had a motive to testify for the Government.

■ Similarly, the instructions regarding the credibility of witnesses were quite adequate. Since Rubin did not contend that Keating was an accomplice, it was unnecessary to give any instruction to the effect that his testimony must be scrutinized with great care because of such a status. *United States v. Swiderski,* 539 F.2d 854, 860 (2d Cir. 1976). Nor did the grant of immunity to Keating require such an instruction in the circumstances of this case. *United States v. Leonard,* 161 U.S. App.D.C. 36, 494 F.2d 955 (D.C. Cir. 1974), cited by appellant is distinguishable in that

the witnesses testifying under immunity were also accomplices, although no accomplice witness instruction had been requested. The full exploration of immunity on the cross-examination of Keating and in summation, coupled with the trial judge's instruction to the effect that fear of prosecution was a factor to be considered in weighing a witness' testimony was adequate to apprise the jury of any interest adverse to that of Rubin which Keating might have. See *United States v. Sarvis,* 173 U.S.App.D.C. 228, 231–232, 523 F.2d 1177, 1180–81 (D.C. Cir. 1973) (appeal following retrial after *Leonard* ).

*The Severance of Rubin*

■ Rubin next argues that it was an abuse of discretion for Judge Motley to have granted the Government's motion to sever Rubin from his co-defendants and to try him separately. We disagree. Although a severance at the Government's insistence is probably a rarity—usually it is the defendant who seeks such relief—it is permissible under the language of F.R. Crim.P. 14 which provides in relevant part that "[i]f it appears that . . . the government is prejudiced by a joinder of . . . defendants in an indictment . . or by such joinder for trial together, the court may . . . grant a severance of defendants or provide whatever other relief justice requires." Although it is true that "[a]s a general rule persons jointly accused should be tried in a single trial, particularly where the charges may be proved against all the defendants by substantially the same evidence, or are based upon the same or a similar series of acts," *United States v. Zim Israel Navigation Co.,* 239 F.Supp. 446, (S.D.N.Y.1965) (Weinfeld, *J.*), "[i]t [is] within the sound discretion of the trial judge as to whether the defendants should be tried together or severally . . . ." *Opper v. United States,* 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954).

The basis for the Government's motion was its plan to introduce against Rubin admissions he made during the interviews with the federal agents, which would create

potential problems under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), with respect to other defendants. The interview notes contained a great deal of detail regarding the conduct of Rubin's co-defendants. Rubin's defense depended heavily on his argument that although he committed certain acts he did so innocently, and that those who were giving him instructions were the ones with the corrupt motives. The likelihood that Rubin's co-defendants would have invoked their Fifth Amendment privilege at a joint trial, the inability of the Government or the court to ascertain at the time of the motion whether Rubin would take the stand in his own defense, demonstrate that the trial judge acted well within her discretion in granting a severance. *See Garris v. United States,* 135 U.S.App.D.C. 251, 253, n.6, 418 F.2d 467, 469, n.6 (D.C. Cir. 1969); *United States v. Dioguardi,* 20 F.R.D. 10, 14 (S.D.N.Y.1956). This case is an appropriate one for application of the principle that "[n]o accused person has any recognizable legal interest in being tried with another, accused with him, though he often has an interest in not being so tried." *United States v. Bronson,* 145 F.2d 939, 943 (2d Cir. 1944) (L. Hand, *J.*) *See United States v. Marchant,* 25 U.S. (12 Wheat.) 480, 482–83, 6 L.Ed. 700 (1827); *United States v. Arcuri,* 405 F.2d 691, 695 (2d Cir. 1968), *cert. denied,* 395 U.S. 913, 89 S.Ct. 1760, 23 L.Ed.2d 227 (1969). In view of the cogent reasons for a separate trial, the balance weighed heavily in favor of granting the Government's motion.

*Statute of Limitations and Pre-Indictment Delay*

■ Rubin's next contentions—that the indictment, which was filed on January 27, 1978, should have been dismissed as barred by the five-year statute of limitations, 18 U.S.C. § 3282, and because of unreasonable pre-indictment delay, require little discussion. The former claim is based on the erroneous premise that the conspiracy terminated on December 6, 1972, when the last of the fraudulently-obtained loans were turned over by Bankers Trust to Tri-State, or at least on January 19, 1973, when the last collateral was pledged. This miscon-

ceives the scope of the alleged conspiracy, which was to continue the scheme of fraudulently obtaining loans and lulling lenders into not calling them. Toward this end Rubin, Deaton and James in January and February 1973 attempted to borrow funds from others, misrepresented to Ludwig and Keating Tri-State's financial condition and the value of the pledged collateral, and falsely listed the All States stock in the OTC pink sheets, with the result that on February 26, 1973, James executed a consolidated rollover demand note, falsely representing to Keating that a railroad strike had hampered coal deliveries. This overt act was clearly in furtherance of the conspiracy and not a mere coverup or concealment of a completed scheme. See *Grunewald v. United States,* 353 U.S. 391, 405–06, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); *United States v. Knuckles,* 581 F.2d 305, 313 (2d Cir. 1978); *United States v. Floyd,* 555 F.2d 45, 48 (2d Cir.), *cert. denied,* 434 U.S. 851, 98 S.Ct. 163, 54 L.Ed.2d 120 (1977); *United States v. Frank,* 494 F.2d 145, 155–56 (2d Cir.), *cert. denied,* 419 U.S. 828, 95 S.Ct. 48, 42 L.Ed.2d 52 (1974).

■ To establish denial of due process based on excessive pre-indictment delay Rubin bears the heavy burden, for the reasons stated by the Supreme Court in *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), of showing not only that he was prejudiced by the delay but that it was so unfair as to violate fundamental concepts of fair play and decency, such as would occur if the prosecutor deliberately used the delay to achieve a substantial tactical advantage. 431 U.S. at 790, 795, 97 S.Ct. 2044. The statute of limitations still provides "the primary guarantee against bringing overly stale criminal charges," *United States v. Marion,* 404 U.S. 307, 322, 92 S.Ct. 455, 464, 30 L.Ed.2d 468 (1971); *see also United States v. Eucker,* 532 F.2d 249, 255 (2d Cir.), *cert. denied,* 429 U.S. 822, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976).

No such showing has been made here. After a thorough hearing Judge Motley found that the delay had not been "due to any [Government] attempt to gain a tacti-cal advantage" and that Rubin had failed to demonstrate actual prejudice. We find no grounds for disturbing these findings. The pre-indictment delay was justified in large measure for several reasons, including the complexity of the evidence, the pendency of an extensive investigation into tax evasion charges, which then had to be dropped for venue reasons, and the resulting interviews of many witnesses from different parts of the country, coupled with an analysis of voluminous financial records, which led to the indictment on non-tax counts. The prosecutor was justified in not seeking the indictment until she was convinced that there would be sufficient evidence to prove guilt beyond a reasonable doubt. Moreover, prior to indictment the prospective defendant suffers no restraint on his liberty. In any event our review of the record fails to reveal any actual prejudice of the type that is legally cognizable. Faded recollections and missing peripheral witnesses are not enough, *United States v. Vispi,* 545 F.2d 328, 331–332 (2d Cir. 1976).

We have examined each of the other points raised by Rubin and find them to be without merit.

The judgment of conviction is affirmed.

FRIENDLY, Circuit Judge, concurring:

Although Judge Mansfield's opinion thoroughly demonstrates that Rubin's conviction should be affirmed even if the limitations of Federal Rule of Evidence 801(d)(1)(B) applied in terms when a prior consistent statement was offered only for rehabilitation, it seems to me important for the future to make clear that despite the contrary dictum in *United States v. Quinto,* 582 F.2d 224, 233–34 (2 Cir. 1978), see also *United States v. Check,* 582 F.2d 668, 681 n. 40 (2 Cir. 1978), the limitations apply only to the use of prior consistent statements as *affirmative evidence* and are not controlling when such statements are used *only for rehabilitation.* Some background is needed to illuminate the problem.

Before adoption of the Federal Rules of Evidence, there had been a lively controversy summarized in 4 Wigmore, Evidence,

§ 1126 (Chadbourn rev. 1972), over the use of prior consistent statements to rehabilitate a witness whose credibility had been attacked on the basis of a prior inconsistent statement. There had been little need to consider the use of prior consistent statements as affirmative evidence, since they were no more probative for that purpose than what the witness had said or could say on the stand; indeed, the case law was practically unanimous in rejecting the use of prior consistent statements as affirmative evidence although the Uniform Rule of Evidence 63, adopted in a few jurisdictions, was to the contrary. See 4 Wigmore, *supra*, §§ 1124, 1132. On the point that was in controversy, namely, the use of prior consistent statements for rehabilitation after impeachment by an inconsistent statement, a number of views had emerged. Two of these, both rather simplistic, were a minority view "that if a contradictory statement counts against the witness, a consistent one should count for him", and a majority view that "since the self-contradiction is conceded, it remains as a damaging fact, and is in no sense explained away by the consistent statement." *Id.* at 259. However, adherents of the majority view recognized an exception when the making of the prior consistent statement would tend to dispel a charge of recent fabrication or improper motive. See Note, Evidence of Prior Consistent Statements Admissible for Rehabilitation when Witness' Testimony Assailed as Recent Fabrication, 45 Calif.L.Rev. 202 (1957).

A third view, apparently originating in Judge Cooley's opinion in *Stewart v. People*, 23 Mich. 63, 74–76 (1871), rightly considered the problem to be more complex and not susceptible to any bright-line solution. Judge Cooley pointed to a number of situations beyond those of recent fabrication and improper motive where it would outrage common sense to reject the prior consistent statement for rehabilitation. The clearest case was when the making of the inconsistent statement was disputed. Thus, when a person was "testifying in a case where he had spent a considerable period of time and a large sum of money in pursuing an alleged criminal to conviction, and he is confronted with evidence of his own conflicting statements," he should be entitled to demonstrate "such circumstances of his connection with the case as would make the impeaching evidence appear to be at war with all the probabilities." Beyond these, "other cases may readily be supposed in which, under the peculiar circumstances, the fact that the witness has always previously given a consistent account of the transaction in question might well be accepted by the jury as almost conclusive that he had not varied from it in the single instance testified to for the purpose of impeachment." He concluded that "though such evidence should not generally be received," its admission "ought not to be set aside except in a clear case of abuse" of discretion.

The most cited decision on the subject in this circuit was Judge Learned Hand's opinion in *United States v. Sherman*, 171 F.2d 619, 621–22 (1948), *cert. denied sub nom. Grimaldi v. United States*, 337 U.S. 931, 69 S.Ct. 1484, 93 L.Ed. 1738 (1949). In that case, a prosecution for stealing goods in interstate commerce, one Oliva testified that Sherman not only was a party to the theft but drove the truck used to effectuate it. The defense impeached Oliva with a written post-arrest statement in which he had not mentioned Sherman and had identified one Whelan as the driver of the truck, and the trial court then allowed the prosecution to introduce a second written statement, made a few weeks after the first, which coincided with the trial testimony. In reversing, Judge Hand said this:

Concededly the second statement was not competent unless the admission of the impeaching statement made it so, for when Oliva made it he had the same motive to fabricate—the hope of lenity—that he had while on the stand. Rationally, it is true, the fact that he changed his story so soon after making the contradictory statement, may have added to the persuasiveness of his testimony; and for that matter most persons would probably consider any earlier consistent account, in

some measure at least, confirmatory of a witness's testimony. The reason for its exclusion is because it has not been made on oath rather than because it has no probative value, although courts have often spoken as though it had none. However, such a statement is as incompetent when the witness has been impeached by an inconsistent statement, as when he has not been. So the Supreme Court decided many years ago; and although the point has apparently never come up again in that court, the lower federal courts have several times applied or recognized the doctrine. (footnotes omitted).

With all respect, the analysis is hard to follow. Judge Hand clearly rejected the irrelevancy argument which was the cornerstone of the majority view. His reason for excluding the evidence was rather that it had "not been made on oath," which sounds in hearsay although he did not add "and subject to cross-examination." But Oliva's second statement was *not* hearsay since, apart from other considerations, it was not offered as proof of the matter asserted but only because the very fact of its having been made would "break the force of the impeachment".

Only two years later this court rendered a decision fundamentally inconsistent with Judge L. Hand's hearsay theory. In *United States v. Corry,* 183 F.2d 155, 156–57 (1950), the court, speaking through Judge A. N. Hand and following Judge Cooley, approved the sensible action of then District Judge J. Joseph Smith in allowing the jury to consider prior consistent statements by government witnesses, without any limitation on the score of difference in motivation, where there was an issue whether an alleged inconsistent statement had been made. We regularly permitted use of consistent statements for rehabilitation without the need of any further showing when, as here, they were needed in the interest of completeness, see *United States v. Weinbren,* 121

F.2d 826, 828–29 (2 Cir. 1941); *United States v. Lev,* 276 F.2d 605, 608 (2 Cir.), *cert. denied,* 363 U.S. 812, 80 S.Ct. 1248, 4 L.Ed.2d 1153 (1960); *United States v. Fayette,* 388 F.2d 728, 733–35 (2 Cir. 1968) (Medina, J.). Later in *Felice v. Long Island Railroad Co.,* 426 F.2d 192, 197–98 (2 Cir.), *cert. denied* 400 U.S. 820, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970), we again approved Judge Cooley's approach, recognizing the peculiar appropriateness of admitting prior statements, quite apart from a claim of recent fabrication, in order to explain away a claim of incompleteness in a statement used in impeachment, and said that "a good deal of latitude should be accorded trial judges in admitting prior consistent statements for rehabilitation." Shortly thereafter, in *Applebaum v. American Export Isbrandtsen Lines,* 472 F.2d 56, 60–62 (1972), the court, speaking through Judge Mansfield, reversed a judgment because of the exclusion of a prior consistent statement offered for rehabilitation in the face of a later inconsistent statement, even though there was nothing to indicate any difference of motivation on the two occasions. This court's flexible approach to the use of prior consistent statements for rehabilitation, with an appropriate limiting charge to be given if requested, was the rule generally followed in the federal courts when the Federal Rules of Evidence were being framed. *Affronti v. United States,* 145 F.2d 3, 7–8 (8 Cir. 1944) (Sanborn, J.) (if some portions of a statement are used for impeachment, other relevant portions may be used to meet its force); *Cafasso v. Pennsylvania R. Co.,* 169 F.2d 451, 453–54 (3 Cir. 1948) (Maris, J.). See also McCormick, Evidence § 49 at 106 (Cleary ed. 1972).[1]

Since the only mention of prior consistent statements in the Federal Rules of Evidence is in Rule 801(d)(1)(B) and this limits admission to cases where the statement "is offered to rebut an express or implied

---

1. The decisions of this court in *United States v. Lombardi,* 550 F.2d 827 (1977) and *United States v. Zito,* 467 F.2d 1401, 1403–04 (1972), approving the admission of prior consistent statements for rehabilitation to rebut a charge

of recent fabrication in no way show that this was the only instance in which such use was permissible. As indicated, in several cases we had gone beyond this.

charge against him of recent fabrication or improper influence," lawyers and judges can be forgiven for being misled into concluding, as was done by dictum in *United States v. Quinto, supra,*[2] that the limitation applies to the use of prior consistent statements for rehabilitation as well as for direct evidence. However, analysis makes it clear that Rule 801(d)(1)(B) simply does not deal with the extent to which prior consistent statements may be used for rehabilitation.

The cited provision is in a definitional section of the article of the Rules which deals with hearsay; Rule 801(d) says that certain consistent statements, among them consistent statements of the kind there enumerated, are not hearsay. But, *pace* Judge Learned Hand's statement in *Sherman,* consistent statements used *only* for rehabilitation are never hearsay since they are not "offered in evidence to prove the truth of the matter asserted", Rule 801(c), but only for the fact of their having been made, 4 Wigmore, *supra,* § 1132 at 294 and cases

there cited in n. 1. By allowing *certain* prior consistent statements to be used as proof of the matter asserted, as they could not previously have been, Rule 801(d)(1)(B) does not imply that others not meeting that standard can never be used for rehabilitation. The Note of the Advisory Committee reproduced in the margin[3] makes clear that the purpose of Rule 801(d)(1)(B) was to admit for general use a category of prior consistent statements that "traditionally" had been admissible for rehabilitation. It does not at all follow, as was said in *Quinto, supra,* 582 F.2d at 233, without benefit of briefing, that the exemption of only certain consistent statements from exclusion as hearsay also determines "which varieties of prior consistent statements can be admitted for the more limited purpose of rehabilitation." Apart from the fact that an article of the Rules concerned with hearsay would be a strange place for dealing with rehabilitation, the very fact that the latter is a "more limited purpose" would suggest that

**2.** The statement in *Quinto* with respect to rehabilitation was no less dictum because the opinion characterized it as a holding. As the *Quinto* opinion clearly showed, the trial court had received the agents' memorandum as direct evidence "under 801(d)(1)(2) [sic]," see 582 F.2d at 231–32, which provides for admission for the truth of the matter asserted. This court held such admission to constitute error under that provision. Anyone reading the opinion can readily see that this was the only issue presented; nothing in the opinion suggested that questions had been raised whether the memorandum could be used solely for rehabilitation if that issue were to arise on a new trial and the briefs show that none had been. It is particularly puzzling that Judge Meskill should regard ourselves as bound by the unnecessary statement in *Quinto* with respect to rehabilitation when, as he correctly says, the Federal Rules of Evidence have not changed the law governing admission of prior consistent statements for that purpose which was considerably broader than Rule 810(d)(1)(B). A judge's power to bind is limited to the issue that is before him; he cannot transmute dictum into decision by waving a wand and uttering the word "hold". There should hardly be need to recall the long established Supreme Court jurisprudence that, as said in *Cohens v. Virginia,* 6 Wheat. (19 U.S.) 264, 399–400, 5 L.Ed. 257 (1821):

It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go be-

yond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.

So far as concerns *United States v. Check,* 582 F.2d 668, 680–81 (2 Cir. 1978), the text of the opinion, written by the distinguished author of *Quinto* and filed only three weeks earlier, carefully and properly limited the effect of Rule 801(d)(1)(B) to the use of consistent statements as affirmative evidence, again the only point there at issue, although note 40 volunteered that "the statements were not admissible even for the more limited purpose of bolstering the witness' credibility."

**3.** Prior consistent statements traditionally have been admissible to rebut charges of recent fabrication or improper influence or motive but not as substantive evidence. Under the rule they are substantive evidence. The prior statement is consistent with the testimony given on the stand, and, if the opposite party wishes to open the door for its admission in evidence, no sound reason is apparent why it should not be received generally.

the standard should *not* be so rigorous. What other types of consistent statements might be received for rehabilitation is a subject, like many others, to which the Rules do not speak.[4] Judge Weinstein's treatise attests that the purpose of Rule 801(d)(1)(B) was simply to give substantive effect to prior consistent statements meeting its standards, 4 Weinstein's Evidence, ¶ 801(d)(1)(B)[01] at 801–99 (1978), thereby moving part but not all of the way toward Uniform Rule of Evidence 63. To apply the severe limitations of Rule 801(d)(1)(B) as a universal rule restricting the use of prior consistent statements for rehabilitation is thus unjustified as a matter of language and of history, and would run counter to the instruction of Rule 102 that:

> These rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, the promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined.

Liberality in allowing prior consistent statements for rehabilitation is peculiarly demanded when, as here, a court is dealing with a record of what was said as distinguished from a narrative of what occurred. The fact to be proved by Agent Cox' testimony was not what Rubin had done but what he had said in his interviews by the agents, Rule 801(d)(2). The allegedly inconsistent and consistent statements were all in one set of records, made at substantially the same time. Under such circumstances, a court that has received inconsistent statements in such records for impeachment should be generous in allowing consistent ones for rehabilitation, since they bear on whether, looking at the whole picture, there was any real inconsistency. This is the great principle of completeness, now enacted in Rule 106. The important thing is that, unless the prior consistent statements are admissible as affirmative evidence under Rule 801(d)(1)(B), the jury should be clearly apprised, if requested, that they are to be considered solely as breaking the force of the impeachment.

MESKILL, Circuit Judge, dissenting:

I respectfully dissent. Although I agree with the majority that neither the pre-indictment delay nor the statute of limitations requires dismissal of the indictment against Rubin, and that the severance of Rubin's trial from that of his co-defendants was not an abuse of discretion, I dissent from the view that the judgment of conviction should be affirmed. The unusual circumstances of Rubin's trial which I believe require reversal and a new trial deserve review in considerable detail.

Between July of 1973 and July of 1976 Rubin was interviewed by government agents and attorneys, including Internal Revenue Service Agent Thomas Cox, several times. Rubin was told of the nature of the government investigation, was advised to obtain counsel, and was asked to consider cooperating. He was also told that "the Government was not going to let him walk away." No written statement was taken from Rubin, but the agents took extensive notes during their interviews. These notes totalled more than 70 pages and were marked Government Exhibit (GX) 66 for identification. Although Cox himself took none of the notes, he testified that he reviewed the notes at the close of each session and believed that they accurately reflected the interviews. Rubin was never shown the notes; nor was he asked to sign them as accurately reflecting the interview; nor were they signed by the agent who had written them. Some of the notes were handwritten and some were typed.

---

4. It is not entirely clear why the Advisory Committee felt it necessary to provide for admissibility of certain prior consistent statements as affirmative evidence. As indicated above, this had been a non-problem. Evidently the Committee considered that since it was permitting certain types of inconsistent statements to be admitted as proof of the facts stated, Rule 801(d)(1)(A), in line with our decision in *United States v. DeSisto*, 329 F.2d 929 (2 Cir.) *cert. denied*, 377 U.S. 979, 84 S.Ct. 1885, 12 L.Ed.2d 747 (1964), it ought to confer a similar benefit on some consistent statements.

Cox took the stand early in the trial. He said he had been present at approximately twelve of the Rubin interviews. He at first had some difficulty remembering when he began attending the sessions with Rubin, saying once "around January 1973" and another time "something like October '73." Asked if there were any documents that would help him be more specific, he said the notes of the interviews might help him. Using GX66 to refresh his recollection, he said that January 9, 1974, appeared to be the date being sought. Louis Bender, Rubin's attorney, objected that Cox was reading the notes rather than refreshing his recollection, and Cox was instructed to use the notes only to refresh his recollection. Cox then proceeded to testify as to what he remembered Rubin saying during the interviews he attended. He constantly was reminded to use the notes only for the refreshment of his recollection.

On cross-examination, Bender began to use the notes to challenge Cox's recollection of what Rubin had said during the interviews. Bender wanted to show that although Cox had testified that Rubin had said certain things during the interviews, the notes of the interviews did not bear him out. The government then suggested that Bender should offer the notes into evidence, a suggestion Bender characterized as "unnecessary" and "self-serving." The court, too, said that "if we are going to read from the notes and ask the witness to read from them, they should be in evidence." Bender then explained that he was treating the notes "like a prior statement made by an agent who was present" and that he had a right "to read a prior inconsistent statement, if it is." The court then made the following ruling:

THE COURT: It isn't his statement. He said that he did not write those notes.

He said that somebody else made that memorand[um]. He used it to refresh his recollection. So you can't use that to impeach his credibility. You can use any statement which he made or any report which he made in writing to impeach his credibility. When somebody else has made the notes you can't attribute it to him.

Bender and the court then made the following agreement—Bender could use the notes to challenge Cox's earlier testimony where he could show that Cox had relied on the notes instead of his independent recollection, but Bender could not use the notes to impeach Cox's credibility.[1] Cox was on the stand for the better part of two days, going through direct examination, cross-examination, redirect and recross. At least for purposes of this dissent, the most important portion of his testimony is that which follows.

Cox testified on direct as to what Rubin had told the agents about the meetings he had had concerning the approval of the requested loans. For example, Cox said that Deaton, Rubin and James went to the bank with the prepared financial statement, had the loan approved, and then had a discussion afterwards about their success. Cox testified that Rubin had told the agents that this discussion included the following:

COX: Deaton said that Ludwig had to be taken care of.

And he asked Rubin how much should he give him. And Rubin said, "I don't know. I've never paid off before." And Deaton said, "Well, what about 5 percent?" And he said, "That should keep Ludwig happy."

On cross-examination, the following exchange took place:

(2) before testifying, if the court in its discretion determines it is necessary in the interests of justice,

an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness.
*See also* note 9, *infra.*

---

1. Compare Fed.R.Evid. 612, which provides in part:

Except as otherwise provided in criminal proceedings by section 3500 of title 18, United States Code, if a witness uses a writing to refresh his memory for the purpose of testifying, either—
 (1) while testifying, or

BENDER: Because you are trained people, you put down your own thoughts on what you pick up from outsiders on notes when you are interrogating a witness? For example, you have in the notes there the word "payoff." Did Mr. Rubin ever tell any of you that he made a payoff?

COX: Using those two words together, he didn't—actually, that he said "pay-off"? I can't say he used that expression.

BENDER: He said he gave money to Mr. Ludwig and he gave money to Mr. Keating, isn't that right?

COX: That's right.

BENDER: Did Mr. Rubin ever tell you that he used the word in talking with you, "bribe"?

COX: I can't say he used the word "bribe" either, no.[2]

On redirect, the government offered pages 1 and 2 of the handwritten notes from the interview dated October 10, 1974, as a "prior consistent statement" by Cox, that is, as a prior statement by Cox relating to Rubin's statements during the October 10 interview regarding payments. The government offered these notes under this theory despite the trial court's earlier ruling that Bender could not treat the notes as prior statements by Cox for purposes of impeachment, the apparent theory being that Bender had used the notes as "prior inconsistent statements" by Cox, that Cox had "adopted" the notes as his own statements, and that because of the nature of the cross-examination the government was entitled to put in Cox's "prior consistent statements." The exhibit was marked GX66A; the text of GX66A is set out in the margin.[3]

Bender immediately objected:

BENDER: Your Honor, in view of the fact that Mr. Cox has indicated that some of the notations which appear in these notes are notations which were written without any relationship, or that is, were written not from what Mr. Rubin said but their own characterizations, I cannot see how this could be a memorandum of a recollection past recorded as to what Mr. Rubin said to them. Certainly it doesn't have any credibility, at least as far as this

---

**2.** Earlier in the cross-examination of Cox, Cox had said to Bender that he did not have to rely on the notes in order to recall the "bribe," meaning the payment of money by Rubin to Ludwig. Bender immediately moved to strike the answer, explaining that Rubin had not used that term in his interview. At this point the government attorney said that if Bender were to ask Cox if the words "paid off" and "bribe" were Rubin's or his, that Cox would say they were Rubin's. The court suggested that Bender ask precisely that question, but Bender said he did not want to ask it because "that's like putting my head in the lion's mouth." The court then told the jury that they were the ones who would have to decide whether the payments to Ludwig were bribes.

**3.** *GX66A*
[October 10, 1974
Pages 1 & 2
Attended by Rubin and Ruffa (Rubin's lawyer) and Levitt, DeGroot, Uberall and Cox (of the government) *handwritten* ]
Pay-off
Day L. approved loan (10–20–72) as per bk. [or "after bk."]
In st. (R&D)—conv. cont'd—in office W. J. *Street* D—wants to know—how much $ for L?
R—Don't know—never pd. off
D—Asks if 5% wld. be o.k.
R—Don't know.

D—We'll discuss with J. when back in office. But we *better take care of L. on Monday.*
D & L tell J. abt. L.
Discussion—what to pay "L"
D—Expect [or "Exper."]—5% to bankers.
R—Rumors L "on take"
J—Give L something
D—Only 1500 avail. from proceeds after budgeting L will be satisfied &: will owe balance to him. Tells R—You know L best—You give money. Tell him there will be more.
Deaton draws ck. to cash ($1500
Endorses.
D—Wants R to cash at bank
R—Thought too risky.
R—Will cash at Englewood CC over wkend.
R cashes over wk'nd.
RD&J
Monday morning in office
R—Have money do you want to turn over now or shld we wait—might be cash short.
D—Instructed to take cash to L. & put in envelope
*Coffee shop episode—O.K.*
R tells L—more coming.
R then goes to office & tells D & J money delivered.
D&J—L happy?
R—Told L more coming & L seemed to be pleased.

case is concerned, what an agent may characterize something to be, rather than what Mr. Rubin himself is reflected as having been said.

So that actually these notes really do not reflect what the agents state Mr. Rubin said and, for that reason, it's objectionable.

I have no objection to Miss Neugarten going in and asking him any question that I did about the notes and see if it refreshes his recollection; but to put this in evidence as if statements which appear here in this paper come from Mr. Rubin, when this witness said they have not, would be, I think, objectionable.

NEUGARTEN: Your Honor, the witness had indicated that he "adopted the statement," by reviewing the notes soon after they were taken, believing them to be accurate.

The witness has been cross-examined as to allegedly prior inconsistent statements concerning what Mr. Rubin said.

Given that, I believe that there has been an implied or expressed challenge, either to the witness' recollection or his credibility, and that as a result I am allowed to permit prior consistent statements.

The court then inquired as to the inconsistency that the government was hoping to clear up by the introduction of the notes, the assumption apparently being that if the government could point to an inconsistency in Cox's testimony that Bender had uncovered during cross then the government would be allowed to introduce the notes as Cox's prior consistent statements. The government responded as follows:

NEUGARTEN: Your Honor, two specific inconsistencies have been drawn to the witness' attention. I believe Mr. Bender's attack has been to go to peripheral matters and attempt to find inconsistencies, and then he will argue to the jury that they are illustrative of the whole.

He has stayed away like a scared rabbit from the central core, the payments where, of course, the witness has been consistent all the time. But then he has set himself up to argue that something inconsistent as to one thing is inconsistent as to everything.

I think there is such explicit detail on payment here that the jury should be allowed to see the consistency of the prior statement.

Bender objected that the word "payoff" was the word used by the agent who had written the notes and not the word used by Rubin in the interview.

BENDER: Judge, you see he [Cox] has testified that this word is their word, not Rubin's. He has already testified to this in detail, what appears on this first page. But to put this in, your Honor, after he has already testified to it, is to give a semblance of belief that Mr. Rubin actually used the word "payoff," just like we said that it was the agents that wrote the notes, that wrote "bribe," that Mr. Rubin never used that word.

So this is just an attempt by the government to get this man's testimony which he has already given as to what Rubin said before the jury, by having these notes here.

To this the court responded:

THE COURT: It is true that on direct, [Cox] said "payoff." On cross, he said he didn't remember those were his exact words. Now [the government] is going to put this in, to show that that was what he put down initially.

When the government suggested further that the "on take" quotation in the notes was what Rubin had actually said during the interview, Bender again argued that that was what the agent had written down rather than what Rubin had actually said. Bender then argued that the agent who had written the notes, rather than Cox, should be the one to say that the notes were statements of what Rubin had said at the interviews.[4] All of his objections were over-

---

4. During its rebuttal case, the government called Edward J. Levitt, a special attorney with the Department of Justice Criminal Division.

He testified on direct that he was the person who wrote the notes now known as GX66A. He said that when he took notes during inter-

ruled, and the excerpt was admitted into evidence; Cox then recited it orally to the jury.

As explained in the majority opinion, the notes labeled GX66A were not the only ones introduced by the government in this fashion.[5] As also explained by the majority, Bender himself was on occasion able to take advantage of the existence of the notes.[6] The jury asked to see the notes during the course of their deliberations.

On appeal, Rubin argues that the "erroneous admission of pre-trial interview notes as prior consistent statements of Government witness Special Agent Thomas Cox" requires reversal of the judgment of conviction, Brief at 12, citing as authority this Court's decisions in *United States v. Check*, 582 F.2d 668 (2d Cir. 1978), and *United States v. Quinto*, 582 F.2d 224 (2d Cir. 1978). Because the text of some of these notes dealt with the payments made by Rubin to

Ludwig and Keating, described by the government as the "central core" of its case, and because Rubin's main defense was that although he made the payments they were considered by him to be after the fact tokens of appreciation rather than "bribes" or "pay offs," Rubin argues further that the error was harmful. For the reasons that follow, I agree with both contentions.

The first question, of course, is whether Rubin's trial counsel objected in such a way as to allow him to raise this issue on appeal. The relevant rule, Fed.R.Evid. 103(a)(1), provides:

> Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of ob-

---

views he would put quotation marks around "key words:"

> Whenever there were what I felt were key words, somebody relating them to me, what I would do is put them down and quote them, that is make quotes around the words meaning those were the words that the person used in describing to me what had occurred.

Thus, the phrase "on take" is quoted in the notes, indicating that Levitt believed Rubin used that phrase to describe what he had heard about Ludwig. The phrase "paid off" is not in quotation marks. On cross-examination, Levitt testified that Rubin did *not* use the term "pay off" during the October 10, 1974, interview:

> The answer is at that occasion I do not think he used the term "pay off," I believe I used the term "pay off."

On redirect, Levitt testified that Rubin had used neither the term "pay off" nor the phrase "paid off" during the October 10 interview, and that those terms were his (Levitt's) characterization of what Rubin had said. He did say, however, that Rubin had used the phrase "paid off" on a prior occasion, July 19, 1973. My inspection of the notes that appear to be dated July 19, 1973, reveals the following entry: "Keating and Ludwig paid off by Rubin.—c.$4 m." The phrase "paid off" is not in quotes.

5. For example, GX66B, relating to the Charter Financial asset included in the financial statement submitted to the bank, was offered by the government "as a prior consistent statement of the witness," Agent Cox, the express purpose for which was "to show Mr. Rubin's state of mind" as it related to the question whether he knew that the Charter Financial contract had

never been executed. Similarly, GX66C, relating to the imprisonment of Raymond Starns, was offered by the government "as a prior consistent statement of the witness," again Agent Cox. And GX66D, relating to Rubin's purchase of All States stock and its listing in the "pink sheets," was introduced by the government "as a prior consistent statement on the subject of pink sheets."

6. For example, on direct Cox testified that at the January 9 interview Rubin had described the initial contacts between Tri-State (represented by Deaton and Rubin) and Bankers Trust (represented by Ludwig and Keating) regarding the possibility of loans to keep Tri-State afloat. Cox said that Rubin had said at the interview that, after the meeting, Rubin had said to Ludwig, "Look, Ray, if you can see your way clear to help us, we will take care of you." On cross, Bender pointed out that the notes included in quotes the sentence, "If you take care of us we will take care of you," but that immediately after this quotation was the notation, not in quotes, "No—Don't No." Cox did not remember Rubin's making this latter statement. This testimony was, understandably, viewed by both the government and defense counsel as relevant to Rubin's knowledge and intent with regard to the making of payments to Ludwig and Keating.

Subsequently, Agent Jennings, also present at the January 9 meeting, testified that Rubin had said that *Deaton* had made the "Look, Ray . . ." comment, and then had told him (Rubin) about it later.

jection, if the specific ground was not apparent from the context.

This Court has on a number of occasions referred to the importance of this rule and the strictness with which it should ordinarily be applied. But if we have learned anything in our deliberations, it is that reciting the rule is much easier than applying it: "The dividing line between specific and general objections is only clear at the extremes . . . . In between . . . are a lot of good faith, though fumbling, efforts to communicate objections . . ." 21 Wright & Graham, Federal Practice and Procedure: Evidence § 5036, at 183. In my judgment, the objections put forth by Rubin's attorney were, under the circumstances, sufficient to justify reaching the merits of this portion of the appeal.

After rejecting as "self-serving" the government's suggestion during cross-examination that he be the one to introduce the interview notes into evidence, Bender himself tried to justify the reading of portions of the notes as a device to challenge Cox's credibility by means of prior inconsistent statements. But, as noted above, the court rejected his efforts:

> THE COURT: It isn't his statement. He said that he did not write those notes. He said that somebody else made that memorand[um]. He used it to refresh his recollection. So you can't use that to impeach his credibility. You can use any statement which he made or any report which he made in writing to impeach his credibility. When somebody else has made the notes you can't attribute it to him.

When on redirect the government, the district court's earlier ruling notwithstanding, offered the notes on the precise and express ground that they were "prior consistent statements" by Agent Cox, Bender, knowing that Cox himself had not written the notes, no doubt assumed that the trial court would reject them on the same basis as was stated in the prior ruling. But this was not to be. Bender then objected that Cox had admitted on cross that the notes included characterizations by the agents of the gist of what Rubin had said rather than statements of Rubin's actual words; that the notes could not be admitted as a memorandum of past recollection recorded (a well known exception to the hearsay rule);[7] and that the agent who had actually written the notes should be the one to state that the notes were accurate statements of what Rubin had said during the interviews, not an agent who was merely present and had not written the notes. At other points, Bender argued that what were being offered as "prior consistent statements" by Cox should not be admitted in the absence of some inconsistency that had been developed on cross between Cox's testimony on direct and the contents of the notes.

When evidence is offered expressly under the rubric of "prior consistent statement," and when an objection to that offer is made, the obvious question presented is whether the evidence is admissible as a prior consistent statement. Bender had good reason to assume that it could not be so admitted, given the trial court's prior ruling on that precise issue. Bender's objection that the notes could not be admitted as past recollection recorded also should have made it clear that in the absence of an applicable exception the proffered evidence was inadmissible hearsay. Given this "context," Fed.R.Evid. 103(a)(1), I would choose to reach the merits. *See also* Fed.R.Evid. 102:

> These rules shall be construed to secure fairness in administration . . . and promotion of growth and development of

---

7. Fed.R.Evid. 803 provides:

 The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

 . . . . .

 (5) Recorded recollection. A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in his memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

the law of evidence to the end that the truth may be ascertained and proceedings justly determined.

I note first that, in my judgment, we are limited on this appeal to the question whether the interview notes were properly admitted as prior consistent statements by Agent Cox. As explained in *United States v. Check, supra,* 582 F.2d at 683, "it would be unfair to consider the admissibility of the evidence for any narrower purpose than that upon which the testimony was unquestionably offered and received at trial." *See also id.* at 681–82, *quoting Shepard v. United States,* 290 U.S. 96, 102–03, 54 S.Ct. 22, 78 L.Ed. 196 (1933). Accordingly, I would refrain from resolving the questions raised on this appeal by reference to the so-called doctrine of completeness. Fed.R.Evid. 106 provides:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Even assuming that the notes were "introduced" by Bender for purposes of the rule because he "utilized [them] in court," *see* Wright & Graham, Federal Practice and Procedure: Evidence § 5075, and assuming that this served to render otherwise inadmissible evidence admissible, *compare*

Weinstein & Berger, Weinstein's Evidence ¶ 106[01], at 106–12, *with* Wright & Graham, *supra,* § 5072, at 346, it is my belief that this Court should not go about concocting theories to support the otherwise erroneous admission of evidence. The rule itself provides that the party seeking its benefits is obliged to invoke its provisions. "Like other evidence rules, the completeness doctrine does not automatically apply; it must be invoked by a party." Wright & Graham, *supra,* § 5076, at 360. Here, to affirm the introduction of these interview notes by citing Rule 106 would be to apply the rule not only "automatically" but retroactively as well. This I would decline to do.[8] And even if I were to decide that the rule should be consulted, I would in this case find that, "in fairness," the notes should not have been admitted. The government could have accomplished its purpose in this regard by means far less prejudicial. *Compare United States v. Lev,* 276 F.2d 605, 608 (2d Cir.), *cert. denied,* 363 U.S. 812, 80 S.Ct. 1248, 4 L.Ed.2d 1153 (1960), *with Camps v. New York City Transit Authority,* 261 F.2d 320, 322 (2d Cir. 1958). *See also United States v. Check, supra,* 582 F.2d at 682–83 n. 43. Similarly, this appeal should not be decided by reference to some extension of the rule governing refreshment of present recollection.[9] I note as well that it is at least peculiar to treat the interview notes here in question

8. I note a certain irony in this regard—if on this record it can be said that the government invoked Rule 106, then surely it can also be said that Rubin properly objected to the admission of Cox's purported "prior consistent statements."

9. *See* note 1, *supra.* There can be no doubt, of course, that the notes were properly used to refresh Cox's present recollection of Rubin's statements during the interviews. *See Portman v. American Home Products Corp.,* 201 F.2d 847, 850 (2d Cir. 1953); *United States v. Rappy,* 157 F.2d 964, 967 (2d Cir. 1946), *cert. denied,* 329 U.S. 806, 67 S.Ct. 501, 91 L.Ed.2d 688 (1947); *Fanelli v. United States Gypsum Co.,* 141 F.2d 216, 217 (2d Cir. 1944). But this itself does not permit or call for the admission into evidence of the item used to refresh. The rule itself provides that only the "adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the wit-

ness thereon, and to introduce in evidence those portions which relate to the testimony of the witness." Moreover, "the portions of the writing which the adverse party introduces may be supplementary in character rather than limited to credibility." 10 Moore's Federal Practice § 612.01[1.–1], at VI–192. "It is fundamental that such memoranda are not admissible unless demanded by opposing counsel, in which event, of course, the purpose of the memoranda is to discredit rather than corroborate the witness's testimony." *Luse v. United States,* 49 F.2d 241, 243 (9th Cir. 1931). *See also Eisenberg v. United States,* 273 F.2d 127, 131–32 (5th Cir. 1959); *Portman v. American Home Products Corp., supra,* 201 F.2d at 850. *But see Markel Service, Inc. v. National Farm Lines,* 426 F.2d 1123, 1128 (10th Cir. 1970); *United States v. Rappy, supra,* 157 F.2d at 967–68.

as "statements" by Cox of what Rubin had said at the interviews.[10] Nevertheless, assuming that the notes were properly deemed to be "statements" by Cox, *cf. United States v. Quinto, supra,* 582 F.2d 224; *Nager Electric Co. v. Charles Benjamin, Inc.,* 317 F.Supp. 645, 648 (E.D.Pa. 1970), *aff'd sub nom. Milwaukee Gear Co. v. Charles Benjamin, Inc.,* 466 F.2d 588, 591–92 (3d Cir. 1972), I turn to the question whether the notes were properly admitted, either for the purpose of bolstering Cox's credibility or as substantive evidence that Rubin had made certain statements during the course of the interviews.[11] In my judgment, it is quite plain that they were not properly admitted.

Judge Waterman has thoroughly explained the law regarding the admission of prior consistent statements in the recent decisions of *United States v. Check, supra,* and *United States v. Quinto, supra.* In *Quinto* he stated:

> For nearly 200 years last past, the courts have enforced, except in certain very limited circumstances, a general prohibition against the use of prior consistent statements. While it is true that the use of such statements to prove the truth of the matters asserted has always been clearly barred by the hearsay rule . . . the courts have also generally prohibited the use of such evidence even when the proponent of the prior consistent statement was simply offering it for the more limited purpose of bolstering the witness's damaged credibility. . . . The rationale for excluding most, but not all, prior consistent statements being offered to establish the witness's credibility

is one of relevancy. "The witness is not helped by [the prior consistent statement;] even if it is an improbable or untrustworthy story, it is not made more probable or more trustworthy by any number of repetitions of it." . . . There have been situations, however, in which courts traditionally have felt that it is indeed relevant to the issue of whether the witness's in-court testimony should be believed that on prior occasions the witness has uttered statements which are consistent with his in-court testimony. "Prior consistent statements traditionally have been admissible to rebut charges of recent fabrication or improper influence or motive." . . . But the prior consistent statements have been so admissible only when the statements were made prior to the time the supposed motive to falsify arose. . . . Only then was the prior consistent statement "relevant" on the issue of credibility; that is, it tended to make the trustworthiness of the witness's in-court testimony more probable, after that testimony had been assailed, inasmuch as the consistency of the prior statement with the witness's testimony at trial made it "appear that the statement in the form now uttered was independent of the [alleged] discrediting influence."

582 F.2d at 232–33 (footnotes and citations omitted).

The federal rules have not changed the law governing admission of prior consistent statements in order to "rehabilitate," the credibility of a witness. 582 F.2d at 233; Fed.R.Evid. 402. And while it is true that Rule 801(d)(1)(B) [12] changed prior evidentia-

---

**10.** *Compare,* Fed.R.Evid. 801(a); Fed.R.Civ.P. 26(b)(3); 18 U.S.C. § 3500(e).

**11.** There can be no doubt that the government offered these notes at least in part as substantive evidence. At oral argument, Rubin's attorney asserted that the evidence had been offered both for the purpose of rehabilitating Cox's credibility and for the purpose of demonstrating the truth of the matters there asserted, the conditions for the latter being outlined in Fed.R.Evid. 801(d)(1)(B). The government attorney confirmed this view at the beginning of her argument:

> [T]he offer that the government made was not articulated as a Rule 801 offer but I think the rubric of the offer which is reprinted in the defendant's brief . . . makes it clear that although the government did not identify the rule by number it was offered as an 801 prior consistent statement.

That the notes were offered under Rule 801 is also assumed in the government's brief and borne out by the record.

**12.** The rule reads as follows:

> A statement is not hearsay if—[t]he declarant testifies at the trial or hearing and is

ry law to the extent that it declares that, under certain circumstances, prior consistent statements are not hearsay, and thus are not inadmissible under Rule 802, and thus are potentially admissible as substantive evidence, 582 F.2d at 233, the test for admissibility for either purpose continues to be the following:

> [T]o avoid having the prior consistent statement found irrelevant under Fed.R. Evid. 402 or incapable of satisfying the requirements of Fed.R.Evid. 801(d)(1)(B), the proponent must demonstrate three things. First, he must show that the prior consistent statement is "consistent with [the witness's in-court] testimony." . . . Second, the party offering the prior consistent statement must establish that the statement is being "offered to rebut an express or implied charge against [the witness] of recent fabrication or improper influence or motive." . . Finally, it is necessary that . . . the

proponent must demonstrate that the prior consistent statement was made prior to the time that the supposed motive to falsify arose . . . . .

582 F.2d at 233–34. *See also United States v. Check, supra,* 582 F.2d at 681 n. 40 ("inasmuch as [the witness's] prior statements could not satisfy the standards set forth in Fed.R.Evid. 801(d)(1)(B), the statements were not admissible even for the more limited purpose of bolstering the witness's credibility"). Using this test,[13] error was committed.

To the extent that the notes labelled GX66A "say" that Rubin himself used the term "pay off" or the phrase "paid off" during the October 10 interview, they are consistent with Cox's testimony on direct. Arguably, therefore, the first prong of the three-part test for admission of prior consistent statements is met.[14] But I cannot

---

> subject to cross-examination concerning the statement, and the statement is . . . consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive . . . . .

**13.** Despite the analysis in Judge Friendly's separate concurring opinion, it is my view that we are required to apply the same test whether the evidence is offered for purposes of rehabilitation or as substantive evidence. In *Quinto* the government offered the IRS memorandum into evidence "to rehabilitate one agent's damaged credibility and further to prove that Quinto had indeed made certain extremely incriminatory remarks to his inquisitors." 582 F.2d at 226. *See also* 582 F.2d at 229 ("the government attempted to introduce the memorandum as a prior consistent statement usable not only to corroborate [the agent's] in-court direct testimony but also usable under Fed.R.Evid. 801(d)(1)(B) as 'substantive evidence' to prove that Quinto had made the fatal admission the IRS agents claim he made"). The Court concluded: "[W]e *hold* that the memorandum should have been excluded regardless of whether it was offered for the truth of the matters asserted therein or merely for the more limited purpose of rehabilitating the in-court testimony of [the agent]." 582 F.2d at 232, I simply cannot bring myself to characterize this holding as mere "dictum." The fact that the parties in *Check* and *Quinto* did not choose to brief extensively the question whether the memorandum was admissible for purposes of rehabilitation as opposed to substantive evidence should not be used to detract from the strength of the express holding that it was not. *See Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 717–18, 98 S.Ct. 2018, 2049, 56 L.Ed.2d 611 (1978) (Rehnquist, *J.,* dissenting) ("Private parties must be able to rely upon explicitly stated holdings of this Court without being obliged to peruse the briefs of the litigants to predict the likelihood that this Court might change its mind."). *See also id.* at 709, n. 6, 98 S.Ct. at 2045 (Powell, *J.,* concurring) ("the mere fact that an issue was not argued or briefed does not undermine the precedential force of a considered holding").

Even were I to accept Judge Friendly's analysis on this matter, however, I would still feel constrained to characterize the notes as inadmissible. In my view, assuming *dubitante* that the notes are "relevant" to the issue of Cox's credibility, their "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Fed.R.Evid. 403. In this regard, I note that even if the text of the notes had been offered as past recollection recorded under Fed.R.Evid. 803(5), the notes themselves could not have been admitted as an exhibit unless offered by Rubin. The reason for this limitation is quite apparently to prevent the jury from giving undue weight to the physical document itself. *See* McCormick, Law of Evidence § 299, 712–13 & n. 8.

**14.** I say "[a]rguably" here because this points to the rather bizarre core of this portion of this appeal. Cox did not author the notes labelled

say that the government successfully established that the notes were being "offered to rebut an express or implied charge against [the witness] of recent fabrication or improper influence or motive," the second prong of the three-part test. During cross-examination, Bender began to ask Cox whether the agents had discussed with Rubin the issue of Rubin's being named as a defendant in any indictment resulting from the investigation. The government objected on grounds of relevance, and was granted a request to discuss the objection out of the hearing of the jury. At the side bar, Bender explained that he believed the agents had discussed immunity with Rubin but that they had conditioned it upon Rubin's presenting more precise information regarding the conduct of the other Tri-State principals. When Rubin failed to provide that information, Bender continued, the agents dropped the discussion of immunity and, apparently, recommended that Rubin be prosecuted. The government argued that such discussions could have no bearing whatsoever on Cox's truthfulness and should not be admitted as if they did. Bender responded that evidence of discussions of immunity "goes to Mr. Rubin's intent in meeting with these agents fully, in many instances without the lawyer, where he established a rapport with the agents and it certainly goes to show that he [Rubin] didn't believe he was guilty of anything and that is why he was talking." The trial court ruled against Bender, and the topic was not pursued. This is not sufficient evidence to support the government's claim that Bender had made "an express or implied charge against [Cox] of recent fabrication or improper influence or motive." The government successfully argued to the trial judge that the alleged discussions with Rubin about immunity could have no bear-

ing on Cox's truthfulness; and Bender was quite clear that the testimony he hoped to elicit from Cox would be used to demonstrate Rubin's motive while attending the interviews, not Cox's motive while testifying at trial. Although Bender did hint at such a motive during summation, by then the notes had long since been admitted. He should hardly be penalized for attempting to make the best of a bad situation. In addition, there was no determination by the trial court that the notes were admissible to rebut a charge of recent fabrication or improper influence or motive. *Cf. United States v. Herring*, 582 F.2d 535, 541 (10th Cir. 1978); *United States v. Zito*, 467 F.2d 1401, 1404 (2d Cir. 1972). Finally, the government did not demonstrate, in any fashion whatsoever, that the notes were made "prior to the time that the supposed motive to falsify arose," the third prong of the three-part test. Given the general disfavor with which prior consistent statements have been, and are to be, treated in the federal courts, the proponent of such evidence has a heavy burden in justifying admission. That burden was not met here.

Thus there was error. I do not believe that it was harmless error. Again making reference to Judge Waterman's *Quinto* opinion, the standard for determining whether an error of the type committed during the trial below is harmless is as follows:

> Regardless of whether there [was] other independently sufficient evidence to convict the defendant, we can find the error harmless only if "our conviction is sure that the error did not influence the jury or had but very slight effect . . . ."

582 F.2d at 235, *quoting United States v. Ruffin*, 575 F.2d 346, 359 (2d Cir. 1978), *quoting Kotteakos v. United States*, 328

---

GX66A; Levitt did. But Cox "adopted" them as statements by him of what Rubin had said at the interview. The notes imply that Rubin himself had used the phrase "paid off." On direct, Cox testified that Rubin had used that phrase during the interview. On cross, however, Cox testified that Rubin had *not* used it. Then on redirect the government offered, and the court received, GX66A as a "prior consist-

ent statement" by Cox in order to support his testimony on direct that Rubin *had* said "paid off." As it turned out, of course, a subsequent government witness, Levitt, the author of GX66A, testified that Rubin had not used the incriminating phrase and that he (Levitt) had jotted it down as his own characterization of what Rubin had said.

U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). I have no such sure conviction here, especially with regard to the admission of GX66A. Rubin at no time denied having made payments of cash to Ludwig and Keating, but he at all times denied making "payoffs" or "bribes." Indeed, these payments were the "central core" of the government's case against Rubin, so described by the government during trial. Bender had succeeded at calling into question Cox's assertion that Rubin had said during the January 9 interview that he (Rubin) had said to Ludwig, "Look, Ray, if you can see your way clear to help us, we will take care of you." This, of course, went directly to the issue of Rubin's knowledge and intent regarding the payments. Bender had also succeeded at getting Cox to acknowledge on cross that Rubin himself may not have used the terms "pay off" or "bribe." For the government to then introduce the notes as prior consistent statements by Cox, purportedly tending to show either that Cox was being more credible on direct than on cross regarding Rubin's precise statements or that Rubin had in fact used those terms could have been nothing less than damaging to Rubin's defense. The fact that the jury asked for the notes during its deliberations and the fact that the jury acquitted Rubin on the substantive count but convicted him on the conspiracy count serve only to buttress my conviction that, far from being harmless, the introduction of these notes into evidence was harmful.

For these reasons I would reverse the judgment of conviction and order a new trial; for these reasons I dissent.